## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

|  |  |
|---|---|
| ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING, ADAM HENDSBEE, A&G SHOOTING, THOMAS COLE, and TLC GUNSMITHING AND ARMORY, <br><br> *Plaintiffs*, <br><br> v. <br><br> AARON FREY, in his personal capacity and in his official capacity as Attorney General of Maine, <br><br> *Defendant*. | Civil Action No. _____ |

## PLAINTIFFS' COMPLAINT
## (INJUNCTIVE RELIEF SOUGHT)

Plaintiffs Andrea Beckwith, East Coast School of Safety, Nancy Coshow, James White, J White Gunsmithing, Adam Hendsbee, A&G Shooting, Thomas Cole, and TLC Gunsmithing and Armory bring this civil action against Defendant Aaron Frey, in his personal capacity and in his official capacity as Attorney General of Maine. Plaintiffs allege the following based on personal knowledge as to all facts relating to them, and on information and belief as to all other matters.

### INTRODUCTION

1.      Maine recently enacted a law that forces people to wait 72 hours before they can acquire a firearm. Maine Bill LD 2238 (SP 958), which is now codified at Title 25, Section 2016 of the Maine Revised Statutes ("Section 2016"), does not purport to be tethered to the time it takes

to conduct a background check, or to any other investigatory efforts into whether someone is disqualified from exercising Second Amendment rights.  To the contrary, it forces law-abiding citizens to wait 72 hours to acquire a firearm even if they pass the requisite background check in a matter of minutes, which most people do.  The law is instead just an unadorned effort to delay the exercise of Second Amendment rights, on the theory that people who seek to acquire firearms are likely animated by murderous or suicidal intentions that may subside if they are forced to wait out a three-day "cooling-off period."

2.     That kind of "cooling-off period" measure has no historical pedigree whatsoever— and, indeed, would have been "unimaginable at the founding."  *Rocky Mt. Gun Owners v. Polis*, 701 F.Supp.3d 1121, 1142 (D. Colo. 2023).  To be sure, a few states adopted waiting periods to acquire a firearm in the early twentieth century to facilitate the advent of then-novel background checks, which at the time were a cumbersome and time-consuming endeavor.  But some of those measures were abandoned as background checks became much easier to process, and federal law now takes the opposite approach, imposing a three-day *limit* on how long a background check may delay the acquisition of a firearm.  Pure "cooling-off period" laws, by contrast, did not appear until the late twentieth century, and most of the few that are on the books date back only to the twenty-first.  That is not because it took two centuries to reach the unremarkable conclusion that some small number of the many people who seek to acquire firearms want to do so for illicit (and immediate) purposes.  It is because generations of lawmakers have recognized that delaying the exercise of Second Amendment rights simply because the government is wary of anyone who wants to exercise them is fundamentally incompatible with the fundamental right to keep and bear arms.

3.     One need look no further than the Plaintiffs in this case to see the devastating effect

that Section 2016 has had on law-abiding citizens in Maine and will continue to have absent this Court's intervention.  Plaintiff Andrea Beckwith is a domestic-abuse survivor who has dedicated her life to helping other women who are trying to escape and recover from abusive situations.  She offers self-defense classes to victims and survivors of domestic violence and other tragic experiences all throughout Maine.  A certified firearms instructor, Beckwith used to be able to help women promptly secure a firearm to defend themselves after providing them with the training needed to safely operate and store it, giving victims of physical, sexual, and emotional abuse a critical measure of security in a most perilous time.  Now, however, she must send them home unarmed for three days—three days in which their abusers will now know that they cannot legally secure the means to defend themselves.

4.      Others, like Plaintiff Nancy Coshow, have been forced to spend hours trekking back and forth between their home and a gun store just to secure the means to exercise their Second Amendment rights—even when they have already lawfully owned firearms for years without incident.  And still others have abandoned efforts to purchase firearms entirely, as evidenced by the massive drops in sales that Plaintiffs J White Gunsmithing, A&G Shooting, and TLC Gunsmithing and Armory have all experienced since Section 2016 took effect.

5.      Section 2016's "cooling-off period" is unconstitutional, but also flouts common sense.  Many firearm purchasers are repeat customers, buying (at least) their second firearm; if one of them is bent on violence or self-harm, Section 2016 will do little to prevent it.  By contrast, the first-time purchasers whose rights Section 2016 impedes are often the very people whose need for a firearm is most acute.  Again, consider the problem of domestic abuse.  In many cases, the abuser already has a firearm, and even if law enforcement confiscates that firearm pursuant to a court order, the abuser can often acquire one illegally, or dupe a friend or family member into loaning

him one.  The victim, meanwhile, is disarmed at the moment when she is most vulnerable.  If she remains desperate to defend herself and her children, she may feel compelled to access a firearm through other means, thereby eliminating the possibility that a responsible, federally licensed dealer or firearms instructor can intervene with life-saving safety guidance and suggestions for alternative or additional resources.  That result—doing little to stop lawbreakers from getting a gun, while imposing significant roadblocks for law-abiding citizens and driving them into the shadows—has nothing to recommend it.

6.     Because Section 2016 burdens law-abiding citizens' right to keep and bear arms in an ahistorical manner for an ahistorical reason that is at odds with the Framers' decision to entrust the people with arms, it violates the Second Amendment.  The Court should promptly declare it unconstitutional and enter an order preliminarily and permanently enjoining its enforcement.

## JURISDICTION AND VENUE

7.     The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343 because Plaintiffs allege that Section 2016 violates the U.S. Constitution and seek relief under 42 U.S.C. §1983.

8.     Venue is proper in this District under 28 U.S.C. §1391(b) because the Office of the Maine Attorney General resides here, and because a substantial part of the events or omissions giving rise to the claim occurred here.

9.     This case is properly assigned to the Bangor office under Local Rule 3(b) because a substantial part of the events or omissions giving rise to the claim occurred in Piscataquis County (where Plaintiff James White lives and where Plaintiff JW Gunsmithing is located), Somerset County (where Plaintiff Adam Hendsbee lives and where Plaintiff A&G Shooting is located), and Penobscot County (where Plaintiff Thomas Cole lives and where Plaintiff TLC Gunsmithing and Armory is located).

## PARTIES

10.     Andrea Beckwith is a resident of Auburn, Maine, who owns and operates East Coast School of Safety, an organization that specializes in providing firearms classes and self-defense training to victims of domestic violence.

11.     Nancy Coshow is a resident of Bridgton, Maine, who sought to acquire a handgun for self-defense purposes and passed an immediate background check, but was unable to acquire a firearm for 72 hours because of Section 2016.

12.     James White is a resident of Guilford, Maine, who owns J White Gunsmithing, a federally licensed firearms dealer with a storefront at 306 Wharff Road, Guilford, Maine 04443. White is also a current member of the Maine House of Representatives, representing District 30.

13.     Adam Hendsbee is a resident of Fairfield, Maine, who owns A&G Shooting, a federally licensed firearms dealer with a storefront at 214 Center Road, Fairfield, Maine 04937.

14.     Thomas Cole is a resident of Hampden, Maine, who owns TLC Gunsmithing & Armory, a federally licensed firearms dealer specializing in selling firearms at weekend gun shows throughout the state of Maine.

15.     Aaron Frey is Maine's 58th Attorney General.  As the state's chief law-enforcement officer, he enforces all civil violations created by state law.  *See* Me. Stat. tit. 17-A, §4-B(1).  He maintains offices at 111 Sewall Street, Augusta, Maine 04330.  Plaintiffs sue Frey in both his personal capacity and in his official capacity.

## BACKGROUND

### I.   "Cooling-Off Period" Laws Are A Late-Twentieth-Century Regulatory Innovation That Remain Uncommon Even Today.

16.     The Second Amendment provides that "the right of the people to keep and bear Arms[] shall not be infringed."  U.S. Const. amend. II.  From the founding to the present, federal

and state authorities have grappled with the best way to respect that right while keeping firearms out of the hands of those who pose a credible threat to the physical safety of others. But in "the early days of the Republic," there was no "open, widespread, and unchallenged" practice, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)), of imposing a waiting period before someone could take possession of a firearm. *See, e.g.*, *Silvester v. Harris*, 41 F.Supp.3d 927, 962 (E.D. Cal. 2014) ("[T]here is no evidence to suggest that waiting periods imposed by the government would have been accepted and understood to be permissible under the Second Amendment.").[1] To the contrary, from the very beginning, courts recognized that "the right of the people to keep and bear arms" "necessarily involves the right to purchase and use them in such a way as is usual" whenever the need to do so arises. *Andrews v. State*, 50 Tenn. 165, 177-78 (1871).

17. Waiting-period provisions first came onto the scene in the twentieth century, around the same time that some states started adopting various types of background checks. *See Silvester v. Harris*, 843 F.3d 816, 831 (9th Cir. 2016) (Thomas, C.J., concurring); *Rocky Mt. Gun Owners*, 701 F.Supp.3d at 1137 ("[N]o law requiring a waiting period was enacted in the United States until 1923."); David B. Kopel, *Background Checks for Firearms Sales & Loans: Law, History, and Policy*, 53 Harv. J. Leg. 303, 360 (2016) (same). These waiting periods were designed to facilitate the background-check process, which was a much more time-consuming endeavor back then. For example, California—one of the first states to enact such a law back in 1923—initially imposed a one-day wait for retail handgun purchases, during which dealers were required to provide

---

[1] The district court opinion in *Silvester v. Harris* was later reversed on other grounds on appeal, 843 F.3d 816 (9th Cir. 2016); the Supreme Court abrogated the Ninth Circuit decision in *Bruen*, *see Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (recognizing abrogation). Plaintiffs cite the *Silvester* district court and court of appeals opinions for the purposes of their historical analysis.

information identifying the purchaser to the local police or county clerk.  *Silvester*, 843 F.3d at 823-24.  New Jersey, another early adopter in 1927, imposed a seven-day waiting period similarly requiring the dealer to forward the purchaser's information to the licensing authority for a background investigation.  *See* Law of Mar. 30, 1927, ch. 321, §6(4)(b), 1927 N.J. Laws 742, 746.  The District of Columbia followed in 1932 with a 48-hour waiting period requiring the dealer to forward the purchaser's information to the D.C. police within six hours.  *See* Act of July 8, 1932, ch. 465, §8, 47 Stat. 650, 652.  Three years after that, in 1935, South Dakota passed its own 48-hour waiting period with a six-hour notification requirement.  *See* Law of Mar. 14, 1935, ch. 208, §9, 1935 S.D. Laws 355, 357.  In the 1970s, 1980s, and 1990s, waiting-period laws enjoyed a brief renaissance, as additional states sought to facilitate background checks in the pre-Internet era.  *Silvester*, 843 F.3d at 824; *see also, e.g.*, *State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996) (Hawaii); 1975 Senate Bill 185, Wis. Legis. (Mar. 15, 1976), https://tinyurl.com/3f8xr6uy (Wisconsin).

18.     While these waiting periods helped facilitate investigations into the purchaser, they also came at a significant cost to law-abiding citizens.  In 2015, a New Jersey woman was fatally stabbed by her ex-boyfriend (against whom she had a restraining order) while waiting for the state to process her application to own a handgun.  Greg Adomaitis, *N.J. gun association calls Berlin woman's death an 'absolute outrage'*, NJ.com (June 5, 2015), https://tinyurl.com/mn32h8f.  And in Wisconsin, a woman was killed by her stalker before she could take possession of the handgun she was attempting to purchase.  *See* Kopel, *supra*, at 309-10.

19.     With the advent of modern federal background-check requirements and the National Instant Criminal Background Check System ("NICS"), waiting-period laws no longer serve an investigatory purpose, as most background checks are completed in a matter of minutes.

Many states that used to have waiting periods have thus abandoned them over the past few decades. *See, e.g.*, 1995 Or. Laws ch. 729 (S.B. 1096) §13 (Oregon); 1997 Ind. Legis. Serv. P.L. 17-1997 §§6, 8 (H.E.A. 1669) (West) (Indiana; §6 repeals a 7-day waiting period while §8 adds an instant-background check requirement); 2009 S.D. Sess. Laws ch. 122 (SB 70) §1 (South Dakota); 2015-2016 Wis. Legis. Serv. 22 (2015 S.B. 35) (West) (Wisconsin); *see also* Brendan O'Brien, *Wisconsin Governor Signs Bill Repealing Handgun Waiting Period*, Reuters (June 24, 2015), https://tinyurl.com/228uby2t (observing that "the instant national background check system makes the waiting period law obsolete," and quoting the then-Governor's remark that repealing the waiting-period law "allows Wisconsin's law to catch up with the 21st century"); Tenn. Bur. Invest., *Guidelines for Federal Firearms Licensees* 1-2, https://tinyurl.com/5yx9rc52 (last visited Nov. 12, 2024) (noting that Tennessee's "fifteen-day waiting period between purchase and delivery of a handgun was eliminated effective November 1, 1998," the same day "[t]he Tennessee Instant Check Law became effective").[2]

20.     Federal law followed a similar trajectory.  Congress initially mandated background checks for most firearm sales in the Brady Handgun Violence Prevention Act of 1993.  Although the Brady Act contemplated a nationwide system of instant background checks, the technology necessary to facilitate that system did not yet exist when Congress passed the law.  So the Brady

---

[2] Oregon, Indiana, Tennessee, South Dakota, and Wisconsin are not the only states that appear to have tried and abandoned waiting-period laws since they came on the scene in 1923.  While Alabama, Connecticut, Iowa, Massachusetts, Missouri, New York, North Carolina, Pennsylvania, and Virginia had some version of a waiting-period law as of 1990, "during which at least some of the" buyer's eligibility "information … [was] verified," U.S. Dep't of Justice, Off. Justice Prog., Bur. of Justice Stats., *Identifying Persons, Other Than Felons, Ineligible to Purchase Firearms* 23, 107 (May 1990), https://tinyurl.com/2s3tpz8x, that no longer appears to be the case, *see* Everytown for Gun Safety, *Which states require a waiting period before gun purchases?*, https://tinyurl.com/6zpcnpkr (last visited Nov. 12, 2024) (listing the current 13 states with waiting-period laws, which do not include the aforementioned jurisdictions).

Act gave the FBI five years to lay the groundwork for what ultimately became NICS, and, in the meantime, Congress embraced a five-day waiting period to facilitate local law enforcement officials conducting cumbersome background checks.  *See Printz v. United States*, 521 U.S. 898, 902-04 (1997).  But mindful of the constitutional concerns with that approach, once NICS came online, Congress abandoned the five-day waiting period and replaced it with an affirmative protection to ensure that delays in processing the checks would not impede the lawful exercise of Second Amendment rights:  A licensed firearms dealer may proceed with a sale three business days after requesting a background check, even if the background check has not yet been completed. *See* 18 U.S.C. §922(t)(1)(B)(ii); *see also* U.S. Dep't of Justice, *Presale Handgun Checks, the Brady Interim Period, 1994-98* (June 1999), https://tinyurl.com/2nrdckfs.

21.    While Congress and some states with waiting periods responded to the advent of NICS and related improvements to background-check processes by abandoning lengthy waiting-period laws, a handful of others responded by trying to re-justify laws originally intended to facilitate a background check.  California is illustrative.  After adopting a one-day waiting period for retail sales of pistols, revolvers, and concealable firearms in 1923, California extended the period to five days in 1965, and then again to 15 days in 1975, both times primarily "to allow more time for more extensive background checks."  *Silvester*, 843 F.3d at 824.  It was not until 1979 that the state even hinted (as a litigating position) that the law might serve a "cooling-off" function too. *See People v. Bickston*, 154 Cal.Rptr. 409, 410 (Cal. App. Dep't Super. Ct. 1979).  And the California legislature did not expressly embrace a cooling-off approach until 1996.  *Silvester*, 41 F.Supp.3d at 946-47.  By then, California had switched to an electronic background check system that allowed most checks to be processed far more expeditiously than previously.  Although the legislature apparently recognized at that point that it no longer had a good justification to force

Californians to wait 15 days to acquire a firearm, it still was not willing to trust law-abiding citizens who have passed a background check with a firearm.  (Indeed, at the time, California was not even willing to admit that the Second Amendment protects the right to keep and bear arms *at all*.)  So California reduced its waiting period, but only to ten days, contending that law-abiding citizens should have to wait out a "'cooling off' period" before they can acquire a handgun, even if they have already passed the requisite background check.  *Id.* at 947.

22.     The Ninth Circuit upheld California's "cooling-off period" law under the means-end balancing test that it used to apply in Second Amendment cases.  *See Silvester*, 843 F.3d at 828.  But *Bruen* subsequently—and emphatically—rejected any role for means-end balancing in the Second Amendment context, abrogating the Ninth Circuit's decision and others applying similar tests.  597 U.S. at 22-23.  And, to put it mildly, "cooling-off periods" do not sit comfortably with Supreme Court precedent.  *Bruen* explicitly cautioned against efforts to impose obstacles for the sole purpose of delaying a law-abiding citizen's ability to carry a firearm.  *Id.* at 38 n.9.  And *United States v. Rahimi* distinguished between permissible efforts to keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of others" and constitutionally suspect efforts to "broadly restrict arms use by the public generally."  144 S.Ct. 1889, 1900-01 (2024).

23.     Unfortunately, those pronouncements have not stopped a few states (including Maine) from breaking with historical tradition and enacting unadorned "cooling-off period" laws for the first time in their histories.  For example, Colorado recently passed a three-day cooling-off period that starts when the seller initiates a background check.  *See* Colo. Rev. Stat. §18-12-115.  Positing that "[d]elaying immediate access to firearms … can help prevent impulsive acts of firearm violence, including homicides and suicides," the legislature effectively subjected all

firearm sales in Colorado to a three-day hold, even if the buyer passes a background-check instantly.  2023 Colo. Legis. Serv. Ch. 125 §1(2)(a) (H.B. 23-1219) (West).  Vermont followed suit, enacting its own three-day "cooling-off" period that starts once a buyer passes a background check, on the theory that doing so will "help to prevent impulsive … violence," H.230, §1(10), https://tinyurl.com/msddz287, despite the Governor's "significant concerns about the provision's constitutionality," Vt. J. Senate 1952 (May 12, 2023), https://tinyurl.com/25t3nfvs.  *See* Vt. Stat. Ann. Tit. 13, §4019a.  New Mexico recently joined the bandwagon too, passing a seven-day "cooling-off period" with the "primary purpose" of "preventing impulsive suicides and homicides."  *Ortega v. Lujan Grisham*, --- F.Supp.3d ---, 2024 WL 3495314, at *4 (D.N.M. 2024). In total, accounting for the post-*Bruen* states pursuing unadorned "cooling-off period" laws, 13 states (including Maine) plus the District of Columbia currently have some sort of waiting-period law, although several are subject to a variety of exceptions.

24.     While a few district courts have preliminarily upheld a few of these measures after *Bruen*, they have done so on reasoning that is incredibly difficult to square with Supreme Court— and even pre-*Bruen* circuit court—precedent.  *See Rocky Mt. Gun Owners*, 701 F.Supp.3d at 1142 (positing that the Second Amendment likely does not protect the right to acquire arms *at all*); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, No. 2:23-cv-710, 2024 WL 3466482, at *25-26 (D. Vt. July 18, 2024) (analogizing "cooling-off period" laws to "historical statutes that restrict[ed] the carry or use of firearms by intoxicated people, as well as the distribution of alcohol in settings 'where firearms were present'"); *Ortega*, 2024 WL 3495314, at *37-38 (analogizing "cooling-off period" laws to historical laws "prohibiting the sale of firearms to" "blacks … Indians; propertyless whites; non-Protestants or potentially unruly Protestants").  *But see, e.g.*, *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (en banc) ("[T]he core Second Amendment right to

11

keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011))); *Brown v. ATF*, 704 F.Supp.3d 687, 700-01 (N.D. W. Va. 2023) (collecting cases).

## II.    Maine Enacts A "Cooling-Off Period" Law.

25.    On April 30, 2024, Maine decided to join this group of outliers.  After having gone more than 200 years of statehood without any waiting period whatsoever, Maine enacted Maine Bill LD 2238 (SP 958), which passed into law on April 30, 2024, without the Governor's signature, and took effect by operation of law on August 9, 2024.  The title of the bill is "An Act To Reduce Suicides and Violent Crimes By Requiring a 72-hour Waiting Period after the Sale of a Firearm." The bill adds a new Section 2016 to Title 25 of the Maine Revised Statutes.

26.    Under Section 2016, "[a] seller may not knowingly deliver a firearm to a buyer pursuant to an agreement sooner than 72 hours after the agreement."[3]  25 Me. Rev. Stat. Ann. §2016(2).  This 72-hour period does not purport to be tied to the time needed to conduct a background check or perform any other kind of investigation into one's suitability to acquire a handgun.  Section 2016 instead just requires everyone in the state to wait three days to acquire a firearm, even if they pass a background check in a matter of minutes (as most people do), and even if they already lawfully own a firearm and have long done so without incident.  Section 2016 is thus an unadorned "cooling-off period" measure, as its title and sponsor forthrightly

---

[3] "Firearm" is defined as "any weapon, whether loaded or unloaded, which is designed to expel a projectile by the action of an explosive and includes any such weapon commonly referred to as a pistol, revolver, rifle, gun, machine gun or shotgun," as well as "[a]ny weapon which can be made into a firearm by the insertion of a firing pin, or other similar thing, or by repair."  25 Me. Rev. Stat. Ann. §2016(1)(C); *see* 17-A Me. Rev. Stat. Ann. §2(12-A).  "Buyer" and "seller" are defined, respectively, as "a person, not including a firearm dealer, who receives possession or ownership of a firearm through an agreement," and "a person or firearm dealer that owns a firearm and that is transferring ownership of the firearm to a buyer pursuant to an agreement."  25 Me. Rev. Stat. Ann. §2016(1)(B), (E); *see also id.* §2016(1)(A) (defining "agreement").

acknowledged. *See* Cate McCusker, *72-hour gun purchase waiting period now Maine law as of Friday morning*, WMTW8 (Aug. 9, 2024), https://tinyurl.com/3at977wf (interviewing state senator who sponsored Section 2016).

27.     Section 2016 is a civil statute enforceable by the Attorney General, and it carries a fine of between $200-$500 for a first violation and $500-$1,000 for each subsequent one.  25 Me. Rev. Stat. Ann.  §2016(3); *see also* 17-A Me. Rev. Stat. Ann. §4-B(1) ("All civil violations … are enforceable by the Attorney General, the Attorney General's representative or any other appropriate public official in a civil action to recover what may be designated a fine, penalty or other sanction.").

28.     Section 2016 applies to all firearm sales in Maine unless (A) the seller knows the buyer works as a law-enforcement officer, a corrections officer, or a certain type of security guard; (B) the buyer holds a firearms-dealer license; or (C) the seller and buyer are family members; the gun is a curio, relic, or antique; or federal or state law exempts the transaction from background-check requirements.  *Id.* §2016(4); *see also id.* §2016(1)(B).

29.     These features make Section 2016 one of the broadest waiting-period provisions in the country.  For example, several of the other waiting-period states have an exception for buyers who have already secured a concealed handgun license; Section 2016 does not.  *Cf., e.g.*, Fla. Stat. §790.0655(2)(a); N.M. Stat. §30-7-7.3.   Some states have an exception for people certified in hunting-safety seeking to buy a rifle or shotgun; Section 2016 does not.  *Cf., e.g.*, Fla. Stat. §790.0655(2)(c).  Some states have an exception for private gun sales; Section 2016 does not.  *Cf., e.g.*, *id.* §790.0655(1)(a).  Other states allow law enforcement to waive the waiting period upon finding that the buyer is facing a threat to herself or her family; Section 2016 does not.  *Cf.* Minn. Stat. §624.7132, subd. 4.  Still other states at least limit the waiting-period requirement to handgun

sales; Section 2016 does not. *Cf., e.g.*, Md. Code Ann., Pub. Safety §§5-101(r), 5-123(a), 5-124(a)(1). In short, given that only 13 states (plus the District of Columbia) have any type of waiting period at all, it is fair to say that Section 2016 is an outlier even among outliers.

### III.   Section 2016 Is Having Immediate And Devastating Effects On Law-Abiding Residents And Federally Licensed Firearm Dealers All Throughout Maine.

30.    In the brief period that it has been on the books, Section 2016 has already had a devastating impact on both individuals and firearms dealers throughout Maine. Indeed, the dramatic drop-off in sales that several dealers have experienced is a powerful illustration of the significant burdens the three-day waiting period imposes on the fundamental right that the Second Amendment protects.

31.    **Plaintiffs Andrea Beckwith & East Coast School of Safety.** Andrea Beckwith is a life-long Maine resident who owns and operates East Coast School of Safety ("East Coast SOS") and is a certified as a firearms instructor by the National Rifle Association and the U.S. Concealed Carry Association. East Coast SOS specializes in private lessons, group courses, seminars, and retreats specifically designed to provide victims of domestic violence with training on first-aid and basic self-defense, including an introduction to safe firearm use and storage, as well as trauma counseling. Through these courses, Beckwith seeks to help victims and survivors of domestic violence take back their lives with confidence; East Coast SOS's motto is "self defense at your comfort level." Ex.A ¶¶1, 9-13.

32.    Beckwith's devotion to helping domestic-violence victims is rooted in her own tragic experience with domestic violence. Beckwith acquired her first weapon after her abusive then-husband threatened her with a loaded gun. She credits her pastor with saving her life by convincing her to leave him and providing her with the support and resources—including a key to the church—to get herself on her feet. Although she ultimately obtained a protective order against

14

her abuser, she recognized that the order alone would not stop him from carrying out his threats of violence: He retained a private investigator to stalk her movements for months, and she knew that he had easy access to firearms. Beckwith decided that the only way to ensure her safety was by obtaining a firearm of her own and taking self-defense classes. On nights when her abuser or his friends would repeatedly pelt the camper in which she was temporarily living with rocks, she would sleep with her gun within reach. Beckwith believes that her abuser's knowledge that she had a gun and firearms training was the primary deterrent preventing him from acting on his threats. Ex.A ¶¶4-7.

33.     Around the time she left her abuser, Beckwith began volunteering with an anti-sex trafficking organization called Thrive New England. She soon realized that the survivors she met were paralyzed by fear, often lacking the confidence even to leave their own home. This experience inspired her to begin teaching self-defense classes, and ultimately led her to found East Coast SOS. In recent years, Beckwith has also founded a 501(c)(3) organization that fundraises to subsidize the cost of training events and to sponsor women who would not otherwise be able to enroll. Through East Coast SOS, Beckwith estimates that she has trained thousands of women across the state who have sought self-defense training after an experience during which they felt threatened and realized that police were too far away to help. Among her former students is a victim of the horrifying 2023 Lewiston shooting; until the victim went through Beckwith's training, she was so traumatized by the shooting that she struggled to leave her home. Ex.A ¶¶8-9, 13-14.

34.     Because Beckwith has become well known throughout the state for working with domestic-violence victims, several times in a typical month she will be connected with a woman who is facing a credible and imminent threat of violence from a former or current intimate partner.

When this happens, Beckwith drops whatever she is doing and meets the woman as soon as possible at the closest gun range.  Beckwith is familiar with myriad studies showing that domestic-violence victims face the highest risk of danger in the first few months after leaving their abuser—and, as a domestic-violence survivor herself, she knows first-hand how fraught the first several days can be.  Ex.A ¶¶15-16.

36.     When Beckwith meets with a woman in crisis, she brings along several models of handguns for her to test.  Once the woman decides which model she is most comfortable with, Beckwith provides a few hours of basic instruction so that the woman can safely operate the firearm and competently defend herself—and, often, her children.  Beckwith then connects the woman with a nearby gun shop where, pending the instant background check required by federal law, the woman used to be able to purchase the firearm and leave feeling safer that same night.  Ex.A ¶17.

36.     That is no longer the case, however, under Section 2016.  Now, a woman trying to escape an abusive partner who poses a credible and imminent threat to her physical safety must wait three days before she can secure a firearm to defend herself—a fact of which her abuser unfortunately will likely be all too aware.  Ex.A ¶¶19, 21.

37.     **Plaintiff Nancy Coshow.**  Nancy Coshow is a grandmother who lives on a roughly five-acre, heavily wooded property in Bridgton.  She is licensed to carry a concealed firearm in Maine and has previously been licensed in two other states.  She has been extensively trained on how to safely store and operate her firearms, both for recreation and for self-defense.  Ex.B ¶¶1-2.

38.     Because their home is visually secluded from the road and neighbors, and because various physical limitations would make it difficult to defend themselves if they were victims of

violent crime, Coshow and her husband are particularly concerned with their safety.  To that end, either she or her husband—recently, almost always her husband—routinely carries a handgun for self-defense purposes.  Although Coshow and her husband have followed this practice for years, they have become especially vigilant of late in light of several recent crimes in the area that appeared to target senior citizens, as well as another violent crime against a young woman in town. Ex.B ¶¶2-4.

39.     Coshow's husband underwent major back surgery on October 16, 2024.  As a result of the surgery, his mobility is expected to be significantly reduced for at least three months.  And because of that incapacitation, Coshow spent the weeks leading up to his procedure preparing to take over primarily responsibility for all household chores, from grocery shopping, to cleaning, to self-defense.  Ex.B ¶5.

40.     Coshow suffers from arthritis in her hands, which makes operating her current higher-caliber handguns difficult and painful.  She accordingly sought to purchase a smaller handgun which she could comfortably operate.  On October 8, 2024, she drove approximately 40 miles (roughly 75 minutes) to Northeastern Firearms in Turner, Maine, where she sought to purchase a Kel-Tec P17.  Ex.B ¶¶4-6.

41.     Because Northeastern Firearms is a federally licensed firearm dealer, federal law required it to conduct a background check on Coshow to confirm that transferring ownership of the Kel-Tec would not give rise to a violation of certain other laws.  18 U.S.C. §922(t).  After informing Coshow of that requirement and collecting the required information from her, the Northeastern Firearms employee contacted NICS to electronically verify that Coshow was eligible to purchase the Kel-Tec.  Ex.B ¶6.

42.     A few minutes later, the Northeastern Firearms employee informed Coshow that

she had passed the background check.  At that point, Coshow paid in full using her credit card and became the lawful owner of the Kel-Tec.  Nevertheless, the Northeastern Firearms employee informed her that, solely because of Section 2016, Northeastern Firearms could not transfer possession of the Kel-Tec to Coshow for 72 more hours, until October 11, 2024.  Ex.B ¶6.

43.     Unable to take immediate possession of the firearm, Coshow drove the 40 miles and 75 minutes back to her residence.  On October 11, 2024—in the midst of last-minute preparations for her husband's surgery—Coshow drove the 40 miles and 75 minutes back to Northeastern Firearms and finally took possession of the Kel-Tec.  Ex.B ¶7.

44.     **Plaintiffs James White & J White Gunsmithing.**  James White is a Navy veteran, a current member of the Maine House of Representatives, and the owner of J White Gunsmithing, a federally licensed firearm dealer in Guilford.  Because J White Gunsmithing is the only gun shop in town, and one of the last gun shops on the way to remote hunting and camping grounds in northern Maine, it often sells firearms to customers with a time-sensitive need to acquire one.  Ex.C ¶¶1-2.

45.     Sometimes, the time-sensitive need results from a tragedy.  In recent years, J White Gunsmithing sold a firearm to a young woman facing threats from a former intimate partner.  White also personally helped a local doctor and his wife quickly secure firearms after they were threatened by a man addicted to painkillers when the doctor refused to refill the addict's prescription.  Ex.C ¶¶6-7.

46.     Other times, the time-sensitive need is recreational.  During hunting season, J White Gunsmithing frequently sells rifles to hunters who need to obtain or replace a firearm on short notice.  In some instances, a hunter has arrived in northern Maine only to realize that something is wrong with his rifle (or even that he forgot it altogether).  Other times, a hunter needs to buy a new

firearm because the one she brought was damaged in an accident.  For example, hunters frequently rest their firearms against pick-up trucks, and it is not uncommon for someone to forget to move one before backing the truck up.  During a year's hunting season, White estimates that his store serves four people who need to buy a new firearm in these circumstances.  Sometimes, the time-sensitivity is particularly acute:  A hunter may have a time-limited permit to hunt moose or bear, or may have a nonrefundable hunting guide booked.  Ex.C ¶8.

47.    When a customer selects a firearm for purchase, a J White Gunsmithing employee collects the required identification information from the customer and calls the NICS hotline to initiate the required background check.  Most of these calls produce an approved background check and an instant "proceed" determination from NICS.  A relatively small number culminate in a failed background check and a "deny" determination.  Calls to NICS can also produce a "delay" directive if NICS determines that it needs additional time to process the background check.  Ex.C ¶3.

48.    Because Section 2016 forces all transactions into a three-day hold, even when NICS instantly issues a "proceed," it has devastated J White Gunsmithing's sales volume:  Handgun sales are down 50% and rifle sales are down 25% from the typical August and September sales figures.  Ex.C ¶4.

49.    **Plaintiffs Adam Hendsbee & A&G Shooting.**  Adam Hendsbee owns A&G Shooting, a federally licensed firearm dealer in Fairfield.  Hendsbee cares deeply about doing business in an ethical and professional manner.  He is eager to get to know his customers and to help them assess their needs, and he always endeavors to sell the right gun to the right person.  Among other things, when he knows or suspects that a customer is buying his or her first firearm, Hendsbee has an in-depth conversation with the customer to go over basic firearm safety and

proper use, and always encourages the customer to enroll in a firearms safety course for further instruction and skill development.  During the course of this conversation, Hendsbee evaluates the customer's maturity and state of mind to ensure that the sale will not endanger either the customer or the community.  If Hendsbee is not confident that the customer is going to do the right thing with the firearm, he turns the customer away.  Ex.D ¶¶1-2.

50.     Hendsbee also implements practices to identify potential straw-purchasers, and he routinely turns away customers (irrespective of their NICS check) when he suspects they may be attempting to purchase a firearm for improper or illegal purposes.  He also reports suspected illegal purchase attempts to the Bureau of Alcohol, Tobacco, Firearms and Explosives, which has commended him for effectively blocking illegal purchases and for working collaboratively with law enforcement.  Ex.D ¶3.

51.     A&G Shooting is located near a very busy truck stop along the highway, and a significant portion of its business comes from truck drivers and other interstate travelers who casually stop into the store to browse its inventory.  Section 2016 has unsurprisingly caused A&G to lose a significant number of sales to those customers, because truck drivers and out-of-state residents passing through are now unable to take a purchased firearm with them, even if they pass a background check instantly.  In addition to causing A&G to lose these firearm sales, Section 2016 has decreased attendant sales of firearm accessories.  Ex.D ¶¶5-7.

52.     Like J White Gunsmithing, A&G Shooting also sells firearms to people with a time-sensitive need to acquire a firearm.  A&G has found itself in such a situation twice since Section 2016 took effect.  In the first instance, a single woman from a nearby town came to the store on a Thursday because her local police officer recommended that she purchase a firearm for home defense.  The woman had just learned that she had a stalker looking through the windows and

20

harassing her on her property.  Although the police issued a restraining order against the accused individual, they also recommended that the woman obtain a firearm for self-defense.  Hendsbee worked with her for over an hour to pick out a firearm that she would be comfortable with and encouraged her to sign up for training to learn additional skills and safety practices.  After Hendsbee collected the woman's identifying information, NICS issued a "proceed" determination, and she paid for the firearm in full.  But because of Section 2016, she could not take possession of the firearm for 72 more hours.  And because A&G is closed on Sundays and Mondays, the next available day for her to pick up the firearm was the following Tuesday.  The woman was visibly shaken to learn that she would have to wait four more days to obtain the means for effective self-defense.  Ex. D ¶ 9.

53.     The following Friday, a married couple whose home had been burgled the previous night came into the store seeking to purchase a gun for home-defense.  Once again, A&G was faced with a customer with a time-sensitive need to acquire a firearm, but once again, Section 2016 forced the couple to wait until the following Tuesday to obtain the means for effective home-defense.  Ex. D ¶ 9.

54.     **Plaintiffs Thomas Cole & TLC Gunsmithing & Armory.**   Thomas Cole is a retired Marine who lives in Hampden, Maine.  Cole owns and operates TLC Gunsmithing & Armory, a federally licensed firearm dealer, and employs his adult daughter to help with the business.  TLC Gunsmithing does not have a storefront, and although it does have a website, it sells firearms almost exclusively at weekend gun shows throughout Maine.  Although that low-overhead business model can be profitable, it requires a significant investment to accumulate and store inventory in advance of a show, as well as significant costs for Cole and his daughter to travel to the show, pay the vendor registration fee, and secure lodging.  For example, TLC Gunsmithing

incurred roughly $2,000 in travel and incidental expenses for Cole and his daughter to travel to a annual gun show at the Augusta Armory from August 24-25, 2024. Last year, TLC Gunsmithing sold approximately 20 firearms at the Augusta Armory gun show. This year, however, TLC Gunsmithing sold *none*—meaning that the show was a $2,000 loss. Ex.E ¶¶1-3, 5.

55.     Section 2016 has caused TLC Gunsmithing's sales to plummet. Because gun shows are two-day weekend affairs, Section 2016 makes it impossible to transfer possession of any firearm sold during the show, even if the purchaser instantly passes a background check. And after each show, Cole and his daughter return to their home, which may be hours away. So if a customer buys a firearm from TLC Gunsmithing during a gun show, to take possession, either the customer will need to travel to Hampden, or Cole and the customer will need to make alternate arrangements. Any alternate arrangements will necessarily involve additional expense: Cole or his daughter will have to extend their stay near the gun show, meet the customer at a mutually agreeable location after the gun show ends, or ship the firearm to another federal firearm licensee closer to the customer, so the other licensee can consummate the sale (typically at an additional cost). Ex.E ¶4.

56.     A few weeks after losing roughly $2,000 in Augusta, TLC Gunsmithing participated in a gun show in Bangor, where it managed to sell five guns—an improvement reflecting the fact that Cole lives in the greater Bangor area, so he could arrange to meet up and transfer the gun after the show with minimal inconvenience or expense. Even still, the costs of participating in the show were still significant enough that TLC Gunsmithing barely broke even. Because of the failure to recoup costs incurred as a result of the Augusta and Bangor gun shows, TLC Gunsmithing canceled plans to sell at any gun show where overnight travel would be required. Ex.E ¶5.

57.     On September 21 and 22, TLC Gunsmithing participated in another gun show in

nearby Lincoln, once again failing to sell a single gun.  Given this continued inability to turn a profit, Cole made the difficult decision to pause TLC Gunsmithing's operations.  Simply put, the business is unable to sustain additional financial losses.  Ex.E ¶6.

58.    If this Court does not enjoin Section 2016, Cole will be forced to liquidate TLC Gunsmithing's substantial firearms inventory, and he has already reached out to auction houses to discuss potential arrangements to do so.  However, if the law is amended by the legislature or enjoined by this Court, Cole intends to resume TLC Gunsmithing's operations.  Ex.E ¶6.

**CLAIM FOR RELIEF**
**Second Amendment Violation**
**42 U.S.C. §1983**

59.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set out herein.

60.    The Second Amendment secures "the right of the people to keep and bear Arms." U.S. Const. amend. II.   Because "the Constitution presumptively protects" arms-bearing "conduct," the state must "justify" any law that regulates that conduct "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.  To do so, it must identify an appropriate and well-established "'historical analogue'" that "burden[ed]" a citizen's Second Amendment rights in a "similar" manner and for a "similar reason[]." *Rahimi*, 144 S.Ct. at 1898, 1903 (quoting *Bruen*, 597 U.S. at 30).

61.    Section 2016's "cooling-off period" prevents law-abiding citizens from taking possession of the firearms they wish to keep and bear for at least 72 hours.  It therefore restricts arms-bearing conduct covered by the plain text of—and "presumptively protect[ed]" by—the Second Amendment.  *Bruen*, 597 U.S. at 17.

62.    Section 2016's "cooling-off period" is not "consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 24.  When a state restricts arms-bearing conduct, it bears

the burden to identify "well-established and representative historical analogue[s]"—in other words, not "outliers"—that are "relevantly similar" in how and why they burden the rights that the Second Amendment protects. *Id.* at 29-30, 34. Put differently, a state must demonstrate that historical analogues burdened the right to keep and bear arms "for similar reasons" as the modern regulation, i.e., "to address [the] particular" public policy "problem[]." *Rahimi*, 144 S.Ct. at 1898. And "[e]ven when" a historical analogue "regulate[d] arms-bearing for a" similar "reason" as a modern regulation, the modern regulation will not "be compatible with the right if [the modern regulation] does so to an extent beyond what was done at the founding." *Id.*

63.     There is no longstanding tradition in this country of forcing law-abiding citizens to wait to acquire firearms. While some states adopted waiting-period laws in the early- and mid-twentieth-century, those laws were imposed to facilitate background checks or other investigatory efforts to determine whether someone is prohibited from possessing a firearm. "Cooling-off period" laws, by contrast, are not tethered to any such efforts; they simply delay the exercise of Second Amendment rights for the sake of delay, on the theory that even law-abiding citizens who have passed a background check cannot be trusted with a firearm. So even assuming twentieth-century waiting-period laws could be justified as a response to the introduction of background check requirements, the handful of "cooling-off period" laws which did not come about for nearly another half century address a fundamentally different "why"—and one that is fundamentally incompatible with the Second Amendment.

64.     Because Section 2016 "is [not] consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, it violates the Second Amendment.

24

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that this Court:

1.      issue an order and judgment declaring that Section 2016 violates the Second Amendment both on its face and as applied to law-abiding citizens purchasing a handgun for self-defense who pass a background check in less than 72 hours;

2.      preliminarily and permanently enjoin enforcement of Section 2016;

3.      award Nancy Coshow nominal damages against Aaron Frey in his personal capacity;

4.      award costs and attorneys' fees pursuant to 42 U.S.C. §1988 and any other applicable statute or authority; and

5.      provide any other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

/s/Joshua A. Tardy
Joshua A. Tardy
Brent A. Singer
RUDMAN WINCHELL
84 Harlow Street
PO Box 1401
Bangor, Maine 04402
(207) 947-4501
jtardy@rudmanwinchell.com
bsinger@rudmanwinchell.com

Paul D. Clement, VA Bar #37915
  (pro hac vice forthcoming)
Erin E. Murphy, VA Bar #73254
  (pro hac vice forthcoming)
Matthew D. Rowen, VA Bar #100113
  (pro hac vice forthcoming)
Kevin Wynosky, PA Bar #326087
  (pro hac vice forthcoming)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
kevin.wynosky@clementmurphy.com

*Counsel for Plaintiffs*

November 12, 2024