# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING, ADAM HENDSBEE, A&G SHOOTING, THOMAS COLE, and TLC GUNSMITHING AND ARMORY,

        *Plaintiffs*,

        v.

AARON FREY, in his personal capacity and in his official capacity as Attorney General of Maine,

        *Defendant*.

Civil Action No. _____

## MOTION FOR PRELIMINARY INJUNCTIVE RELIEF & INCORPORATED MEMORANDUM OF LAW

Plaintiffs Andrea Beckwith, East Coast School of Safety, James White, J White Gunsmithing, Adam Hendsbee, A&G Shooting, Thomas Cole, and TLC Gunsmithing and Armory respectfully move this Court for an order under Federal Rule of Civil Procedure 65 granting a preliminary injunction, without bond, enjoining Defendant Aaron Frey from enforcing Title 25, Section 2016, of the Maine Revised Statutes pending final resolution of Plaintiffs' claim.

## INTRODUCTION

The Maine legislature recently enacted, without the Governor's signature, one of the most restrictive anti-gun laws in the Nation: New Section 2016 of Title 25 of the Maine Revised Statutes mandates a 72-hour "cooling-off period" on nearly all firearm sales in Maine. Under Section 2016, it does not matter why a Mainer seeks to buy a firearm; nor does it make a difference if she has a concealed-carry permit or a hunting license. It does not even matter if she faces a credible, imminent threat of violence and needs a firearm for self-defense. Everyone must wait at least three days—even *after* passing a background check—before they can take possession of a new firearm, on the theory that even those who have proven themselves law-abiding and satisfied all regulatory requirements to acquire a firearm are likely to be inflamed by murderous or suicidal passions that need to "cool" before they can be entrusted with the exercise of a fundamental constitutional right.

Nothing in our Nation's historical tradition of firearm regulation supports that kind of "cooling-off period" measure, which is a twentieth-century regulatory innovation that is flatly inconsistent with the Second Amendment's original meaning. And that radical approach has nothing to recommend it. However laudable the goal of preventing suicide and impulsive violence, Section 2016 undoes the Framers' decision to *entrust* law-abiding citizens with the basic means of effective self-defense. And for people facing credible, imminent threats of violence, stripping their Second Amendment rights, even temporarily, can be deadly. Every day Section 2016 remains on the books, it exposes domestic-violence victims and others to grave danger, emboldening their

1

abusers and eliminating any real possibility of defending themselves and their children.  The Court should promptly enter a preliminary injunction blocking Section 2016's enforcement.

At bottom, "the constitutional right to bear arms … for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'"  *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022).  If Maine enacted a 72-hour "cooling-off period" on inflammatory speech, this Court would doubtless issue a preliminary injunction on First Amendment grounds "notwithstanding a State's purported interest in giving the speaker time to calm down."  *Silvester v. Becerra*, 138 S.Ct. 945, 951-52 (2018) (Thomas, J., dissenting from denial of certiorari).  So too if Maine enacted a 72-hour "cooling-off period" on a substantive-due-process right.  Indeed, in the era predating *Dobbs v. Jackson Women's Health Organization*, the First Circuit preliminarily enjoined a law imposing a *24-hour* "cooling-off period" before a woman could obtain an abortion.  *See Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1023 (1st Cir. 1981).  There is simply no reason to tolerate a 72-hour "cooling-off period" in the Second Amendment context—and, as this case illustrates, every reason not to.  Rather than "single[] out" the Second Amendment "for special—and specially unfavorable—treatment," *McDonald v. City of Chicago*, 561 U.S. 742, 778-79 (2010), the Court should promptly enjoin Section 2016.

## STATEMENT OF THE CASE

1. Section 2016 imposes a 72-hour delay between when someone agrees to purchase a firearm and when she can take possession of it.  "A seller may not knowingly deliver a firearm to a buyer pursuant to an agreement sooner than 72 hours after the agreement," even if the purchaser passes the requisite background check immediately, as most people do.  25 Me. Rev. Stat. §2016(2).  Section 2016 thus is not designed to facilitate any investigation into whether someone is disqualified from exercising Second Amendment rights.  It is instead designed to impose a

2

"cooling-off period" before one may exercise those rights, on the theory that forcing people to wait 72 hours to acquire a firearm may curb impulsive violence or self-harm—a design evident from the title of the bill:  "An Act To Reduce Suicides and Violent Crimes by Requiring a 72-hour Waiting Period after the Sale of a Firearm."  Maine Bill LD 2238 (SP 958); *see also* Cate McCusker, *72-hour gun purchase waiting period now Maine law as of Friday morning*, WMTW8 (Aug. 9, 2024), https://tinyurl.com/3at977wf (interviewing bill sponsor).

Section 2016's proscription applies to all firearm sales in Maine unless (A) the seller knows the buyer works as a law-enforcement officer, a corrections officer, or a certain type of security guard; (B) the buyer holds a firearms-dealer license; or (C) the seller and buyer are family members; the gun is a curio, relic, or antique; or federal or state law exempts the transaction from background-check requirements.  25 Me. Rev. Stat. §2016(4); *see also id.* §2016(1)(B).  Section 2016 is a civil statute enforceable by the Attorney General, and it carries a fine of between $200-$500 for a first violation and $500-$1,000 for each subsequent violation.  *Id.* §2016(3); *see also* 17-A Me. Rev. Stat. Ann. §4-B(1) ("All civil violations … are enforceable by the Attorney General, the Attorney General's representative[,] or any other appropriate public official in a civil action to recover what may be designated a fine, penalty or other sanction.").

2.  Section 2016 has had a devastating effect on law-abiding citizens and business-owners throughout Maine.  Take, for instance, the experiences of Andrea Beckwith.  Beckwith is a life-long Mainer who owns and operates East Coast School of Safety ("East Coast SOS"), which specializes in private lessons, group courses, seminars, and retreats designed to provide domestic-violence victims with training on first-aid and basic self-defense, including an introduction to safe firearm use and storage, as well as trauma counseling.  Through these courses, Beckwith seeks to help domestic-violence victims and survivors take back their lives with confidence; East Coast

SOS's motto is "self defense at your comfort level."  The U.S. Concealed Carry Association and National Rifle Association have certified Beckwith as a firearms instructor, and she routinely carries her own handgun for self-defense purposes.  Compl.Ex.A ¶¶1-2, 9-13.

Beckwith's devotion to helping domestic-violence victims stems from her own tragic experiences.  She acquired her first firearm after her abusive then-husband threatened her with a loaded gun.  Beckwith credits her pastor with saving her life by convincing her to leave her abuser and providing her with the support to get herself on her feet.  Although she obtained a protective order against her abuser, she recognized that the order alone would not stop him from carrying out his violent threats:  He retained a private investigator to stalk her movements for months, and Beckwith knew that he could easily obtain a different firearm from family or friends.  Beckwith accordingly concluded that she could ensure her safety only by obtaining her own firearm and taking self-defense classes.  On nights when her abuser or his friends repeatedly pelted the camper in which she was temporarily living with rocks, Beckwith would sleep with her gun within reach. Today, she believes that her abuser's knowledge that she had a firearm and the training to use it was the primary deterrent stopping him from acting on his threats.  Compl.Ex.A ¶¶4-7.

Around the time she left her abuser, Beckwith began volunteering with an anti-sex-trafficking organization called Thrive New England.  She soon realized that fear and trauma paralyzed the survivors she met, destroying their confidence even to leave their own homes.  This experience inspired her to begin teaching self-defense classes and to found East Coast SOS.  More recently, Beckwith founded a 501(c)(3) organization that fundraises to subsidize training-session costs and to sponsor women facing financial need.  Beckwith has trained thousands of women across the state who have sought self-defense training after feeling threatened and realizing that police were too far away to help.  Her former students include a victim of the horrifying 2023

Lewiston shooting; until the victim went through Beckwith's training, the experience had so traumatized her that she struggled to leave her home.  Compl.Ex.A ¶¶8-9, 13-14.

Because Beckwith has become well known throughout the state for working with domestic-violence victims, she is often connected with women facing a credible and imminent threat of violence from a former or current intimate partner.  When this happens, Beckwith drops what she is doing and meets the victim as soon as possible at the closest gun range.  She knows that myriad studies show that domestic-violence victims face the most danger in the first few months after leaving their abuser—and, as a survivor herself, she knows first-hand how fraught the first few days can be.  When Beckwith meets with a woman in crisis, she brings along several handguns for her to test.  Once the domestic-violence victim decides which model she is most comfortable with, Beckwith teaches the victim how to safely operate the firearm and competently defend herself (and often her children too).  Beckwith then connects the victim with a local gun shop where, pending the instant background check that federal law requires, the victim used to be able to purchase the firearm and leave feeling safer that same night.  Compl.Ex.A ¶¶15-17.

Section 2016 has devastated Beckwith's ability to help her clients obtain this immediate security.  Now, instead of leaving empowered to defend herself and her family, a domestic-violence victim leaves a gun shop having been told at her most vulnerable moment that she cannot exercise a basic constitutional right for 72 more hours.  Compl.Ex.A ¶¶16, 19, 21.

3. Section 2016 has also had a ruinous effect on the many businesses throughout Maine that serve customers with a time-sensitive need to acquire a firearm.  For instance, James White is a Navy veteran, current member of the Maine House of Representatives, and the owner of J White Gunsmithing, a federally licensed firearm dealer in Guilford.  JWG's sales plummeted after

Section 2016 took effect, with handgun sales dropping 50% and rifle sales falling 25% from the typical sales volume in prior years for August and September.  Compl.Ex.C ¶¶1, 4.

Those figures, while devastating to White and his employees, are not terribly surprising. JWG is among the last firearm dealers on the way to remote hunting and camping grounds in northern Maine.  As one would thus expect, it does substantial business with customers who live outside the immediate area.  And, somewhat obviously, the ability to make a sale to an out-of-town customer often hinges on the customer's ability to take the firearm home that same day, which one can no longer do owing to Section 2016.  That is especially true for customers with a time-sensitive need to acquire a firearm.  For example, during hunting season, JWG routinely does business with hunters whose rifles have been damaged in the middle of a multi-day hunting trip.  Now, with Section 2016, a damaged rifle can effectively end a hunting trip prematurely—and if the hunter has already booked a nonrefundable reservation for a hunting guide, as many hunters do, a damaged rifle can cause substantial financial injury.  JWG is also the only gun store in a county nearly three times larger than the state of Rhode Island.  Since it can (and often does) take police upwards of an hour to arrive in an emergency, people must be prepared to defend themselves against credible, imminent threats of violence.  In recent years, White and his business have helped multiple people secure firearms under those circumstances: a young woman facing threats from a former intimate partner; and a local doctor and his wife threatened by a man addicted to painkillers after the doctor refused to refill the addict's prescription.  Compl.Ex.C ¶¶2, 4-8.

Adam Hendsbee, the owner of A&G Shooting in Fairfield, has seen a similar effect on his business, which is located near a truck stop along the highway.  Because of its location, A&G Shooting used to do substantial business with truck drivers and other interstate travelers who—at least before Section 2016—would stop into the store to casually browse its inventory.  Now,

Section 2016 has wiped away that portion of A&G Shooting's business.  What is more, in the weeks since Section 2016 took effect, A&G Shooting has served multiple customers facing a time-sensitive need to acquire a firearm.  For instance, a single woman from a nearby town came to the store on a Thursday because her local police officer recommended that she purchase a firearm for home defense after a stalker began harassing her on her property.  Hendsbee worked with the woman for over an hour to pick out the right firearm that she would be comfortable with and encouraged her to sign-up for training to learn additional skills and safety practices.  After doing so, the woman passed the background check and paid for the firearm, but because of Section 2016, she could not take possession of the firearm for 72 more hours.  And because A&G Shooting is closed on Sundays and Mondays, the next available day for her to pick up the firearm was the following Tuesday.  The woman was visibly shaken to learn that she would have to wait four more days to obtain the means for effective self-defense.  The following Friday, a married couple whose home had been burgled the previous night came into the store seeking to purchase a gun for home-defense.  Once again, A&G was faced with a customer with a time-sensitive need to acquire a firearm, and once again, Section 2016 forced the couple to wait until the following Tuesday to obtain the means for effective self-defense.  Section 2016 impedes A&G Shooting's ability to serve these urgent self-defense needs.  Compl.Ex.D ¶¶1, 5-7, 9.

Section 2016 has had an even more pronounced effect on gun shows in Maine.  Thomas Cole is a retired Marine living in Hampden, who owns TLC Gunsmithing and Armory, a federally licensed firearm dealer specializing in selling firearms at weekend gun shows.  Because these shows are Saturday-Sunday affairs, Section 2016 makes it impossible to legally transfer a firearm sold during a show.  Unsurprisingly, Section 2016 has devastated gun-show sales in Maine.  If a merchant somehow manages to make a sale, he must either make arrangements to transfer the

firearm in-person after the show ends, or ship the firearm to a federally licensed dealer closer to the customer, so the other licensee can consummate the transfer (often for a fee). Both options increase the cost and inconvenience for merchants and customers alike. Compl.Ex.E ¶¶1-2, 4.

TLC Gunsmithing's recent experience bears this out. In the past, it participated in the same gun shows and could reliably expect to sell at least 20 guns per show. Now, it can hope to sell only a handful at best—and at two post-Section 2016 shows, it has sold no guns at all. That precipitous decline means that the business has hemorrhaged money, repeatedly failing to recoup the substantial fees incurred traveling from show to show. Unable to withstand additional losses, TLC Gunsmithing has made the difficult decision to temporarily suspend operations. Absent relief from this Court, Cole intends to shut down the business and liquidate its substantial inventory at auction. Compl.Ex.E ¶¶3, 5-6.

## ARGUMENT

The Court should enjoin Section 2016 pending final resolution of Plaintiffs' Second Amendment challenge. "When assessing a request for a preliminary injunction, a district court must consider '(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest," with the first factor being "the most important." *Norris ex rel A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). When, as here, the case involves a constitutional challenge, "the first and second … factors" functionally "collapse[]" into one, *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805-06 (10th Cir. 2019), because "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed," *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). *Accord Planned Parenthood*, 641 F.2d at 1023. Similarly, when, as here, a state is the opposing party, the third and fourth factors merge with the constitutional inquiry. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021); *Baird v.*

8

*Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).  Because Section 2016 is exceedingly unlikely to withstand constitutional scrutiny, and because it is causing Plaintiffs and others in Maine substantial and imminent injuries, the Court should preliminarily enjoin its enforcement.

**I.      Plaintiffs' Second Amendment Claim Is Likely To Succeed On The Merits.**

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed."  That right is an individual and fundamental one, presumptively shared by all Americans.  *Bruen*, 597 U.S. at 70.  "[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'"  *United States v. Rahimi*, 144 S.Ct. 1889, 1897 (2024).  To do so, it must demonstrate that "the challenged regulation is consistent with the principles that underpin our regulatory tradition"—i.e., that the regulation "impos[es] similar restrictions" on the ability to keep and bear arms "for similar reasons" as "laws that our tradition is understood to permit."  *Id.* at 1898.

"[C]entral to this inquiry" are two questions:  the "why" and the "how."  *Id.*  As to the former, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations."  *Id.*  As to the latter, "[e]ven when a law regulates arms-bearing for a permissible reason, … it may not be compatible with the [Second Amendment] right if it does so to an extent beyond what was done at the founding."  *Id.*  The government bears the burden to justify a modern regulation by identifying a historical tradition of "relevantly similar" regulations—in effect, historical regulations with the same "why" and "how."  *Id.* at 1897-98.

1. The threshold textual inquiry here is simple, as it will be in most cases.  Section 2016 applies to nearly every member of the public, *see* 25 Me. Rev. Stat. §2016(4), and thus to "the people" that the Second Amendment protects.  Section 2016 also applies to all firearm sales, *see* 25 Me. Rev. Stat. §2016(1)(C), and thus to "Arms" within the meaning of the Second Amendment.

The only question at the threshold, then, is whether Section 2016 restricts someone's ability to "keep" and "bear" those arms.  The answer is obvious:  Yes, it does.

"[T]he most natural reading of 'keep Arms' … is to 'have weapons,'" and "the natural meaning of 'bear arms' … implies [] the carrying of [a] weapon [] for the purpose of 'offensive or defensive action.'"  *District of Columbia v. Heller*, 554 U.S. 570, 582-83 (2008).  Section 2016 precludes a buyer from acquiring the firearm she wants to have (and carry) for an arbitrary period of time.  And among Plaintiffs are those who would like to purchase firearms ("Arms") so that they may have ("keep") and carry ("bear") them (in addition to those who are licensed to sell them).  The threshold textual inquiry here thus begins and ends with a simple fact:  Because "the challenged condition restricts [Plaintiffs'] ability to bear or keep [a] firearm—even those [they] would lawfully store at home for self-defense—[it] unquestionably implicates [their] Second Amendment rights."  *United States v. Perez-Garcia*, 96 F.4th 1166, 1181 (9th Cir. 2024).

2. The dispositive question, then, is whether "cooling-off period" laws are "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 24.  They are not.

Since the advent of the firearm, it has been an unfortunate reality that some people who try to acquire firearms want them for illicit (and immediate) purposes.  Yet while many measures have been enacted over the centuries to address that concern—from penalty-backed prohibitions on using firearms for improper purposes, to bans on possession by individuals who are likely to misuse them, to background checks to identify individuals subject to such disqualifications, to permits and licenses to carry firearms outside the home—no state for 200 years forced law-abiding citizens to wait out an unadorned "cooling-off" period before they could acquire a firearm.  Indeed, no historical evidence whatsoever even remotely "suggest[s] that waiting periods imposed by the government would have been accepted and understood to be permissible under the Second

Amendment." *Silvester v. Harris*, 41 F.Supp.3d 927, 962 (E.D. Cal. 2014).  To the contrary, from the very beginning, courts recognized that "the right of the people to keep and bear Arms," U.S. Const. amend. II, "necessarily involves the right to purchase and use them in such a way as is usual" whenever the need to do so arises.  *Andrews v. State*, 50 Tenn. 165, 177-78 (1871).

In fact, "no law requiring a waiting period was enacted in the United States until 1923." *Rocky Mt. Gun Owners v. Polis*, 701 F.Supp.3d 1121, 1137 (D. Colo. 2023).  And even then, waiting-period laws were not enacted for the unadorned purpose of delaying a law-abiding citizen's ability to possess a firearm.  They were instead enacted to facilitate newly enacted background-check regimes, giving law enforcement time to conduct investigations that used to be much more time-consuming.  *See* David B. Kopel, *Background Checks for Firearms Sales & Loans:  Law, History, and Policy*, 53 Harv. J. Leg. 303, 308-09 (2016).  For example, California—one of the first states to enact such a law back in 1923—initially imposed a one-day wait for retail handgun purchases, during which dealers were required to provide information identifying the purchaser to the local police or county clerk.  *Silvester v. Harris*, 843 F.3d 816, 823-24 (9th Cir. 2016).  New Jersey, another early adopter in 1927, imposed a seven-day waiting period similarly requiring the dealer to forward the purchaser's information to the licensing authority for a background investigation.  *See* Law of Mar. 30, 1927, ch. 321, §6(4)(b), 1927 N.J. Laws 742, 746.  The District of Columbia followed in 1932 with a 48-hour waiting period requiring the dealer to forward the purchaser's information to police within six hours.  *See* Act of July 8, 1932, ch. 465, §8, 47 Stat. 650, 652.  Three years after that, South Dakota likewise passed a 48-hour waiting period with a six-hour notification requirement.  *See* Law of Mar. 14, 1935, ch. 208, §9, 1935 S.D. Laws 355, 357.  In the 1970s, 1980s, and 1990s, waiting-period laws enjoyed a brief renaissance, as additional states sought to facilitate background checks in the pre-Internet era.  *Silvester*, 843 F.3d at 824; *see*

*also, e.g.*, *State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996) (Hawaii); 1975 Senate Bill 185, Wis. Legis. (Mar. 15, 1976), https://tinyurl.com/3f8xr6uy (Wisconsin).

While these waiting periods helped facilitate investigations into the purchaser, they also came at a significant cost to law-abiding citizens.  In 2015, a New Jersey woman was fatally stabbed by her ex-boyfriend (against whom she had a restraining order) while waiting for the state to process her application to own a handgun.  Greg Adomaitis, *N.J. gun association calls Berlin woman's death an 'absolute outrage'*, NJ.com (June 5, 2015), https://tinyurl.com/mn32h8f.  And in Wisconsin, a woman was killed by her stalker before she could take possession of the handgun she was attempting to purchase.  *See* Kopel, *supra*, at 309-10.

With the advent of modern federal background check requirements and the National Instant Criminal Background Check System ("NICS"), waiting-period laws no longer serve an investigatory purpose, as most background checks are completed in a matter of minutes.  Many states that used to have waiting periods have thus abandoned them over the past few decades.  *See, e.g.*, 1995 Or. Laws ch. 729 (S.B. 1096) §13 (Oregon); 1997 Ind. Legis. Serv. P.L. 17-1997 §§6, 8 (H.E.A. 1669) (West) (Indiana; §6 repeals a 7-day waiting period while §8 adds an instant-background check requirement); 2009 S.D. Sess. Laws ch. 122 (SB 70) §1 (South Dakota); 2015-2016 Wis. Legis. Serv. 22 (2015 S.B. 35) (West) (Wisconsin); *see also* Brendan O'Brien, *Wisconsin Governor Signs Bill Repealing Handgun Waiting Period*, Reuters (June 24, 2015), https://tinyurl.com/228uby2t (observing that "the instant national background check system makes the waiting period law obsolete," and quoting the then-Governor's remark that repealing the waiting-period law "allows Wisconsin's law to catch up with the 21st century"); Tenn. Bur. Invest., *Guidelines for Federal Firearms Licensees* 1-2, https://tinyurl.com/5yx9rc52 (last visited Nov. 12, 2024) (noting that Tennessee's "fifteen-day waiting period between purchase and delivery of a handgun

was eliminated effective November 1, 1998," the same day "[t]he Tennessee Instant Check Law became effective").[1]

Federal law followed a similar trajectory.  Congress initially mandated background checks for most firearm sales in the Brady Handgun Violence Prevention Act of 1993.  Although the Brady Act contemplated a nationwide system of instant background checks, the technology necessary to facilitate that system did not yet exist when Congress passed the law.  So the Brady Act gave the FBI five years to lay the groundwork for what ultimately became NICS, and, in the meantime, Congress embraced a five-day waiting period to facilitate local law enforcement officials conducting cumbersome background checks.  *See Printz v. United States*, 521 U.S. 898, 902-04 (1997).  But mindful of the constitutional concerns with that approach, once NICS came online, Congress abandoned the five-day waiting period and replaced it with an affirmative protection to ensure that delays in processing the background checks would not impede the people's lawful exercise of their Second Amendment rights:  A licensed firearms dealer may proceed with a sale three business days after requesting a background check, even if the background check has not yet been completed.  *See* 18 U.S.C. §922(t)(1)(B)(ii); *see also* U.S. Dep't of Justice, *Presale Handgun Checks, the Brady Interim Period, 1994-98* (June 1999), https://tinyurl.com/2nrdckfs.

While Congress and some states with waiting periods responded to the advent of NICS and related improvements to background-check processes by abandoning lengthy waiting-period laws, a handful of others responded by trying to re-justify laws originally intended to facilitate a

---

[1] Those are not the only states that tried waiting-period laws only to abandon them.  As of 1990, Alabama, Connecticut, Iowa, Massachusetts, Missouri, New York, North Carolina, Pennsylvania, and Virginia had some version of a waiting-period law, "during which at least some of the" buyer's eligibility "information … [was] verified."  U.S. Dep't of Justice, *Identifying Persons, Other Than Felons, Ineligible to Purchase Firearms* 23, 107 (May 1990), https://tinyurl.com/2s3tpz8x.  But none appears to have such a law today.  *See* Everytown for Gun Safety, *Which states require a waiting period before gun purchases?*, https://tinyurl.com/6zpcnpkr (last visited Nov. 12, 2024).

background check.  California is illustrative.  After adopting a one-day waiting period for retail sales of pistols, revolvers, and concealable firearms in 1923, California extended the period to five days in 1965, and then again to 15 days in 1975, both times primarily "to allow more time for more extensive background checks."  *Silvester*, 843 F.3d at 824.  It was not until 1979 that the state even hinted (as a litigating position) that the law might serve a "cooling-off" function too.  *See People v. Bickston*, 154 Cal.Rptr. 409, 410 (Cal. App. Dep't Super. Ct. 1979).  And the California legislature did not expressly embrace a cooling-off approach until 1996.  *Silvester*, 41 F.Supp.3d at 946-47.  By then, California had switched to an electronic background check system that allowed most checks to be processed far more expeditiously than previously.  Although the legislature apparently recognized at that point that it no longer had a good justification to force Californians to wait 15 days to acquire a firearm, it still was not willing to trust law-abiding citizens who have passed a background check with a firearm.  (Indeed, at the time, California was not even willing to admit that the Second Amendment protects the right to keep and bear arms *at all*.)  So California reduced its waiting period, but only to ten days, contending that law-abiding citizens should have to wait out a "'cooling off' period" before they can acquire a handgun, even if they have already passed the requisite background check.  *Id.* at 947.

The Ninth Circuit upheld California's "cooling-off period" law under the means-end balancing test that it used to apply in Second Amendment cases.  *See Silvester*, 843 F.3d at 828. But *Bruen* subsequently—and emphatically—rejected any role for means-end balancing in the Second Amendment context, abrogating that decision and others applying similar tests.  *Bruen*, 597 U.S. at 22-23.  And, to put it mildly, "cooling-off periods" do not sit comfortably with *Bruen* and *Rahimi*.  The former explicitly cautioned against efforts to impose obstacles for the sole purpose of delaying a law-abiding citizen's ability to carry a firearm.  *Id.* at 38 n.9.  And the latter

distinguished between permissible efforts to keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of others" and constitutionally suspect efforts to "broadly restrict arms use by the public generally." *Rahimi*, 144 S.Ct. at 1900-01.

Unfortunately, those pronouncements have not stopped a few states (including Maine) from breaking with historical tradition and enacting unadorned "cooling-off period" laws for the first time in their histories. For example, Colorado recently passed a three-day cooling-off period that starts when the seller initiates a background check. *See* Colo. Rev. Stat. §18-12-115. Positing that "[d]elaying immediate access to firearms … can help prevent impulsive acts of firearm violence, including homicides and suicides," the legislature effectively subjected all firearm sales in Colorado to a three-day hold, even if the buyer passes a background-check instantly. 2023 Colo. Legis. Serv. Ch. 125 §1(2)(a) (H.B. 23-1219) (West). Vermont followed suit, enacting its own three-day "cooling-off" period that starts once a buyer passes a background check, on the theory that doing so will "help to prevent impulsive … violence," H.230, §1(10), https://tinyurl.com/msddz287, despite the Governor's "significant concerns about the provision's constitutionality," Vt. J. Senate 1952 (May 12, 2023), https://tinyurl.com/25t3nfvs. *See* Vt. Stat. Ann. Tit. 13, §4019a. New Mexico recently joined the bandwagon too, passing a seven-day "cooling-off period" with the "primary purpose" of "preventing impulsive suicides and homicides." *Ortega v. Lujan Grisham*, --- F.Supp.3d ---, 2024 WL 3495314, at *4 (D.N.M. 2024). In total, accounting for the post-*Bruen* states pursuing pure "cooling-off period" laws, 13 states (including Maine) plus the District of Columbia currently have some sort of waiting-period law, although several are subject to a variety of exceptions.

"Cooling-off periods" are thus a thoroughly modern innovation even as compared to administrative waiting-period laws—and one that would have been "unimaginable at the

15

founding." *Rocky Mt. Gun Owners*, 701 F.Supp.3d at 1142.  They "did not exist near the time of adoption of the Second and Fourteenth Amendments, and they are not common now."  *Silvester*, 41 F.Supp.3d at 963.  That is about as far from "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, as it gets.

On top of that, Maine's law is an outlier even among outliers.  Some states with cooling-off period laws at least allow law enforcement to waive the cooling-off period upon finding that the buyer faces threats to herself or her family.  *Cf.* Minn. Stat. §624.7132, subd. 4.  Section 2016 does not.  Some states provide some avenue for a person facing a threat of violence to acquire a gun, either through a private gun sale, *cf., e.g.*, Fla. Stat. §790.0655(1)(a), or by limiting the cooling-off period law to handguns, *cf., e.g.*, Md. Code Ann., Pub. Safety §§5-101(r), 5-123(a), 5-124(a)(1).  Section 2016 does not.  Some states have an exception for buyers who have a concealed handgun license, *cf., e.g.*, Fla. Stat. §790.0655(2)(a); N.M. Stat §30-7-7.3, or for people certified in hunting-safety seeking to buy a rifle or shotgun, *cf., e.g.*, Fla. Stat. §790.0655(2)(c).  Section 2016 does not.  Section 2016 thus is not just ahistorical, but anomalous even today.

3. While a handful of district courts have preliminarily upheld the late-breaking "cooling-off period" laws enacted by Colorado, Vermont, and New Mexico after *Bruen* came down, these out-of-circuit opinions are neither binding nor persuasive.  For example, the *Rocky Mountain Gun Owners* court acknowledged that Colorado's 72-hour "cooling-off period" law would have been "unimaginable at the founding." 701 F.Supp.3d at 1142.  But it then posited that the law does not even implicate the Second Amendment because the right to keep and bear arms purportedly does not include the right to acquire them.  *See id.* at 1133-34.  The court then concluded that even if it did, a 72-hour "cooling-off period" is "relevantly similar" to historical laws "regulating the carrying and use of firearms by intoxicated individuals" or to licensing schemes.  *Id.* at 1144-45;

16

*see also Vermont Federation of Sportsmen's Clubs v. Birmingham*, --- F.Supp.3d ---, 2024 WL 3466482, at \*25-28 (D. Vt. 2024) (same).  Another district court tried to analogize "cooling-off periods" to odious early American laws restricting the sale of firearms to Native Americans, slaves, and people who spoke out against the government "out of a fear that some among those groups might use those firearms to do harm in society."  *Ortega*, 2024 WL 3495314, at \*38.

The *Rocky Mountain* court's textual argument is a nonstarter for the reasons already explained.  *See* p.10, *supra*.  And the remaining claims distort the historical-tradition inquiry beyond recognition.  Historical laws restricting "the carrying and use of firearms by intoxicated individuals" imposed a temporary restriction on a distinct group of people with a particular propensity to engage in dangerous and impulsive behavior.  Section 2016, by contrast, "broadly restrict[s] arms use by the public generally."  *Rahimi*, 144 S.Ct. at 1902.  That distinction is critical, as our Nation's historical tradition is one of "distinguish[ing] citizens who have been found to pose a credible threat to the physical safety of others from those who have not."  *Id.* at 1901-02.  Prohibiting intoxicated people from using firearms fits within that tradition; forcing law-abiding citizens who have passed a background check to wait three days before they can exercise their fundamental right to keep and bear arms does not.  The analogy to overtly racist laws fares even worse.  While trying to draw a historical tradition from laws governing groups that were not thought to possess Second Amendment rights at the time is a perilous exercise, those laws likewise burdened discrete populations on the (odious) belief that they were predisposed to violence.  That is patently different from burdening the rights of *all* the people entitled to keep and bear arms, on the theory that *everyone* who seeks a firearm is probably inflamed by murderous or suicidal passions that need to "cool" before they can be entrusted with the exercise of a fundamental right.

The analogy to licensing regimes fails for the same reason. A licensing regime "modest[ly] delay[s] … the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens." *Rocky Mt. Gun Owners*, 701 F.Supp.3d at 1145. Section 2016, by contrast, delays the delivery of a firearm *even after* the state has assured itself that the person who wants to acquire it is a "law-abiding, responsible citizen[]." The former has nothing to do with the latter. Indeed, *Bruen* explicitly distinguished between delays owing to "ensur[ing] only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" and delays that simply "prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 597 U.S. at 38 n.9. Because "cooling-off periods" fall decidedly into the latter category, they are profoundly out-of-step with our Nation's historical tradition of firearm regulation.

Ultimately, these courts all made the same basic mistake of assuming that if the state may delay the exercise of Second Amendment rights for *some* reasons, then it may delay them for any. That logic ignores the Supreme Court's repeated admonitions that courts must focus on both "how" *and "why"* a law restricts Second Amendment rights. *Rahimi*, 144 S.Ct. at 1898 (emphasis added); *see also Bruen*, 597 U.S. at 29-30. It is one thing to delay the exercise of Second Amendment rights in service of accomplishing some other permissible regulatory purpose, like verifying that someone is not legally disqualified from keeping and bearing firearms. It is another thing entirely to delay their exercise on the theory that *anyone* who wants to exercise them—even a law-abiding citizen who promptly passes a background check and satisfies any other criteria the state may impose—is likely inflamed by violent or suicidal passions that may subside after a few days. To ignore that commonsense distinction is to eliminate the "why" component of the test entirely.

## II.   The Remaining Factors Strongly Favor Injunctive Relief.

1. "When an alleged deprivation of a constitutional right is involved … most courts hold that no further showing of irreparable injury is necessary" to obtain a preliminary injunction. 11A

Wright & Miller, *Federal Practice & Procedure* §2948.1 (3d ed. 2024); *see, e.g.*, *Free the Nipple*, 916 F.3d at 792; *Obama for Am.*, 697 F.3d at 436.  The First Circuit instructs district courts to presume irreparable injury for "infringements of … rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009).  At least three circuits have held that the Second Amendment fits that bill.  *See Baird*, 81 F.4th at 1046-47; *Wrenn v. District of Columbia*, 864 F.3d 650, 667-68 (D.C. Cir. 2017); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).  And a 72-hour cooling-off period constitutes an irreparable Second Amendment injury in the same way that a 72-hour cooling-off period on inflammatory speech would constitute an irreparable First Amendment injury, *cf. Silvester*, 138 S.Ct. at 951-52 (Thomas, J., dissenting), or a 24-hour cooling-off period on abortions caused an irreparable injury before *Dobbs*, *see Planned Parenthood*, 641 F.2d at 1023.

There is thus no need to prove any other irreparable injury—but Plaintiffs have done so in spades.  The licensed firearms dealers and their owners are hemorrhaging money as a result of Section 2016.  *See* Compl.Ex.C ¶4, Ex.D ¶¶6-7, Ex.E ¶¶3, 5-6.  That alone is irreparable injury, as sovereign immunity will prevent them from recovering damages for those losses.  *See Concord Hosp., Inc. v. N.H. Dep't of Health & Human Servs.*, --- F.Supp.3d ---, 2024 WL 3650089, at *24 (D.N.H. 2024).  Moreover, the potential for "economic loss … so great as to threaten the existence of the movant's business" constitutes irreparable injury even when (unlike here) damages may be available.  *Vaqueria Tres Monjitas*, 587 F.3d at 485; *see also Starlight Sugar, Inc. v. Soto*, 114 F.3d 330, 332 (1st Cir. 1997) ("[T]he potential value of an evanescent business opportunity may be extremely difficult to measure, after the fact.").  And Section 2016's tendency to "shift[] purchasers" away from in-person sales at brick-and-mortar storefronts or gun shows to gun stores

focusing on online sales constitutes additional "irreparabl[e] harm" given that the retailer Plaintiffs specialize in the former. *Vaqueria Tres Monjitas*, 587 F.3d at 485; *see also* Ex.D ¶4.

As bad as things are for the retailers and their owners, things look far worse for Beckwith and the women she helps. It does not get more irreparable than denying a domestic-violence victim the ability to defend herself and her children at the very moment she faces the greatest risk. Even when one's "ability to exercise [her] right to self-defense" is restricted only "for 'minimal periods' of time," courts do not hesitate to deem the Second Amendment injury irreparable. *Koons v. Reynolds*, 649 F.Supp.3d 14, 42-43 (D.N.J. 2023) (collecting cases). This Court should too.

2. Maine "has no interest in enforcing an unconstitutional law, [and] the public interest is harmed by the enforcement of laws repugnant to the United States Constitution." *Tirrell v. Edelblut*, --- F.Supp.3d ---, 2024 WL 3898544, at *6 (D.N.H. 2024). The third and fourth preliminary-injunction factors thus "follow directly from a conclusion as to the probable outcome on the merits." *Planned Parenthood*, 641 F.2d at 1023.

Moreover, the public interest favors injunctive relief even apart from that general rule, as Section 2016 puts domestic violence victims and others at profound risk, even though it is hard to see how such laws will do much to reduce impulsive violence. After all, most firearm purchasers are not first-time purchasers, but rather already own firearms that they could use if they really did secretly harbor murderous or suicidal intentions. *See* Kim Parker et al., Pew Rsch. Ctr., *America's Complex Relationship with Guns* 22 (June 22, 2017), https://tinyurl.com/mry4nzyd; *see also* Compl.Ex.C ¶9, Compl.Ex.D ¶8. So Section 2016 does little (if anything) to further public safety while leaving non-gun owners facing credible and imminent threats as sitting ducks. The equities and the public interest thus weigh decisively in favor of a preliminary injunction.

## CONCLUSION

The Court should grant the motion for preliminary injunctive relief.

Respectfully submitted,

/s/Joshua A. Tardy
Joshua A. Tardy
Brent A. Singer
RUDMAN WINCHELL
84 Harlow Street
PO Box 1401
Bangor, Maine 04402
(207) 947-4501
jtardy@rudmanwinchell.com
bsinger@rudmanwinchell.com

Paul D. Clement, VA Bar #37915
  (pro hac vice forthcoming)
Erin E. Murphy, VA Bar #73254
  (pro hac vice forthcoming)
Matthew D. Rowen, VA Bar #100113
  (pro hac vice forthcoming)
Kevin Wynosky, PA Bar #326087
  (pro hac vice forthcoming)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
kevin.wynosky@clementmurphy.com

*Counsel for Plaintiffs*

November 12, 2024