## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

ANDREA BECKWITH, *et al.*,     )
     )
    Plaintiffs,     )
     )
    v.     )     Civil Action No. 1:24-cv-00384-LEW
     )
AARON FREY, in his personal capacity     )
and in his official capacity as Attorney     )
General of Maine,     )
     )
    Defendant.     )

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, WITH INCORPORATED MEMORANDUM OF LAW

In April 2024, Maine's Legislature enacted a law imposing a 72-hour waiting period for certain purchases of firearms.[1]  Studies demonstrate that by preventing impulsive firearm purchases, waiting periods meaningfully reduce firearm suicides and homicides, with one study suggesting that a waiting period law would have prevented twelve suicides in Maine in one year.

Plaintiffs move to enjoin enforcement of Maine's waiting period law, arguing that it violates the Second Amendment.  ECF No. 4.  Their motion should be denied, primarily because plaintiffs are unlikely to prevail on the merits.  Without exception, courts have rejected Second Amendment challenges to waiting period laws.  First, the Second Amendment's plain text protects the right to "keep" and "bear" (i.e., "possess" and "carry") arms.  It does not apply to a law regulating the acquisition of arms unless the law is so burdensome that it effectively prohibits keeping and bearing arms.  Imposition of a modest 72-hour delay hardly rises to that level.  Second, the Supreme Court of the United States has made clear that laws regulating the commercial sale of firearms are "presumptively lawful."  Maine's waiting period law is just such a law.  Finally, even

---

[1]  The law took effect on August 29, 2024, months before plaintiffs filed suit.

if the Second Amendment's plain text applied to waiting period laws, such laws are, as other courts have held, consistent with the "Nation's historical tradition of firearm regulation" and thus pass muster under the Supreme Court's test for assessing challenges to firearm laws.

Because plaintiffs are unlikely to prevail on the merits, and because they cannot establish the other necessary elements, their motion for preliminary injunction should be denied.

## MEMORANDUM OF LAW

### Legislative Background

On February 28, 2024, "An Act to Address Gun Violence in Maine by Requiring a Waiting Period for Certain Firearm Purchases" was introduced into Maine's Legislature. L.D. 2238 (131st Legis. 2024). The bill sought to impose a 72-hour waiting period on certain purchases of firearms.

The legislative history demonstrates that the purpose for imposing a waiting period was to reduce suicides and homicides by preventing the impulsive purchase of firearms. *See, e.g.,* Rep. Cloutier Testimony ("Test.") (Ex. 1); Rep. Craven Test. (Ex. 2); Rep. Speaker Talbot Ross Test. (Ex. 3); Sen. Rotundo Test. (Ex. 4); Rep. Rielly Test. (Ex. 5); Sen. Vitelli Test. (Ex. 6); Rep. Zager Test. (Ex. 7). Many of these legislators pointed to a finding from the American Academy of Pediatrics ("AAP") that states with firearm waiting periods had 51 percent fewer firearm suicides than did states without waiting periods. According to the AAP report, the use of firearms is the most lethal form of suicide (it has an approximate 90 percent mortality rate) and suicide survivors contemplated their actions in a very brief window of time. *Waiting Periods for Firearm Purchases* (Ex. 8). Legislators also cited a study concluding that states adopting waiting periods had a seventeen percent decrease in homicides and a six percent decrease in suicides. *Handgun waiting periods reduce gun deaths*, Luca, M., *et al.* (Ex. 9).

The AAP testified that more than 90 percent of firearm deaths in Maine are suicides and that in 2021, 56 percent of suicides involved a firearm.  Anderson Test. (Ex. 10).  The Maine Medical Association and the Maine Osteopathic Association testified that in 2020, firearms became the leading cause of death among children.  Cain Test. (Ex. 11).  The Maine Coalition to End Domestic Violence ("MCEDV") testified in support of the bill, stating that domestic violence advocates do not advise victims to obtain firearms as part of their safety plans because "statistically, the victim is more likely to have it used against them than to find it helpful."  Stark Test. (Ex. 12).  The MCEDV also testified that for victims who feel that firearms are necessary for their safety, the waiting period would not put them in jeopardy because services are available to keep victims safe during the waiting period.  *Id*.  The Maine Association of Psychiatric Physicians referred to a study in which 70 percent of suicide survivors reported that less than an hour elapsed between when they first thought of suicide and when they attempted it, and 24 percent reported that less than five minutes elapsed.  Moltz Test. (Ex. 13).  Also in the legislative record is a February 2023 report from the Maine Center for Disease Control and Prevention finding that of the 178 firearm deaths in Maine in 2021, 158 were suicides (accounting for 56 percent of all suicides).  *Report to the Legislature* (Ex. 14).

With some amendments, the bill was enacted as P.L. 2023, ch. 678, and is now codified at 25 M.R.S. § 2016.  In relevant part, it provides:  "A seller may not knowingly deliver a firearm to a buyer pursuant to an agreement sooner than 72 hours after the agreement."  25 M.R.S. § 2016(2).  The 72-hour waiting period is "concurrent with any waiting period imposed by any background check process required by federal or state law."  *Id*.  The law does not apply to sales to law enforcement officers, correction officers, certain private security guards, or firearm dealers.  *Id*. § 2016(4)(A), (B).  It does not apply to sales between certain family members or to sales of curio,

relic, and antique firearms.  *Id.* § 2016(4)(C)(1), (2).  Finally, the waiting period law does not apply to sales for which no background check is required under state or federal law.  *Id.* § 2016(4)(C)(3).[2, 3]  Sellers who violate the law commit a civil violation for which a fine may be adjudged. *Id.* § 2016(3).[4]

### Argument

"To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). "The sine qua non of this four-part inquiry is likelihood of success on the merits." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

### I.  The plaintiffs are not likely to prevail on the merits.[5]

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S.

---

[2]  Under Maine law, background checks are required for sales at gun shows and sales resulting from advertisements (with exceptions for sales between family members and sales of curio, relic, and antique firearms). 15 M.R.S. § 395. Under federal law, federal firearms licensees (importers, manufacturers, and dealers) must contact the national instant criminal background check system to verify an individual's eligibility to possess firearms before transferring firearms to non-licensees. 18 U.S.C. § 922(t).  Federal statute allows up to three business days, and in the case of a transferee under age 21, ten business days, for a response.  *Id.*

[3]  Plaintiffs allege that among states' waiting period laws, Maine's law is an "outlier even among outliers." PI Brief, 16.  As discussed below, federal courts have upheld Vermont's, Colorado's, and New Mexico's waiting period laws. The only difference that plaintiffs identify between Maine's law and these other states' laws is that in New Mexico, the waiting period law has an exception for buyers with concealed handgun licenses.  *Id.*

[4]  Before the law took effect on August 9, 2024, the Maine Department of Public Safety and the Maine Attorney General issued guidance to firearm sellers and buyers regarding the law's requirements. *See* https://www.maine.gov/dps/sites/maine.gov.dps/files/inline--files/Advisory%20on%20Waiting%20Period%20Law_1.pdf.

[5]  Plaintiffs appear to be making both a facial and an as-applied challenge to Maine's waiting period law.  Complaint (ECF No. 1), at 25.  In a facial challenge, "the challenger must establish that no set of circumstances exists under which the [law]would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  In an as-applied challenge, the challenger must only establish that the law is unconstitutional as to the challenger's specific conduct.  *See Daggett v. Comm'n on Gov'l Ethics & Election Practices*, 205 F.3d 445, 472 (1st Cir. 2000).  Here, plaintiffs fail to establish that the waiting period violates the Second Amendment as applied to them, and this necessarily means that their facial challenge also fails.

Const. amend II.[6]  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects the individual right to possess a firearm unconnected with militia service.  In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court set forth the test that courts currently use in resolving Second Amendment challenges to firearm regulations.  First, the court must determine whether "the Second Amendment's plain text covers an individual's conduct."  *Id*. at 17.  If it does, the regulation is nevertheless valid if the government "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id*.; *see also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 43 (1st Cir. 2024).

   *A.  The Second Amendment's plain text does not cover the purchase of firearms.*

   At the first step of the *Bruen* test, "the plaintiff has the burden of establishing that 'the Second Amendment's plain text covers' either the conduct they engaged or intended to engage in."  *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) (quoting *Bruen*, 597 U.S. at 17); *see also Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, No. 2:23-CV-710, 2024 WL 3466482, at *7 (D. Vt. July 18, 2024).  Plaintiffs fail to meet that burden here.  The Second Amendment protects the right to "keep" and "bear" arms.  As the Supreme Court as recognized, to "keep" arms means to "have" or "possess" arms, and to "bear" arms means to "carry" arms.  *Heller*, 554 U.S. at 583-84.  The Second Amendment says nothing about any right to purchase or otherwise acquire arms, much less to do so immediately.  And this is not surprising.  The impetus for the Second Amendment was not a desire to guarantee unregulated sales of firearms, but instead the fear that the federal government might try to disarm the populace, as King George III attempted to do to colonists in the 1760s and 1770s.  *McDonald v. City of Chicago*, 561

---

[6]  The Second Amendment is made applicable to the States via the Fourteenth Amendment.  *McDonald v. City of Chicago*., 561 U.S. 742 (2010).

U.S. 742, 768-69 (2010). The Second Amendment thus confers a right to retain arms, not an unfettered right to immediately acquire them free of any regulation.[7]

The Supreme Court has recognized that laws causing delays in taking possession of firearms do not, absent unusual circumstances, implicate the right to keep and bear arms. In *Bruen,* the Court clarified that it was not calling into question "shall-issue" licensing regimes that require applicants to undergo a background check or pass a firearms safety course before being allowed to carry a handgun in public. 597 U.S. at 38 n.9.[8] These laws necessarily impose a delay before a person can take possession of a firearm.[9] Such laws "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" and "appear to contain only narrow, objective, and definite standards guiding licensing officials, rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion." *Id.* (cleaned up). Maine's waiting period law is the same. By deterring impulsive behavior, it helps ensure that purchasers will act responsibly with their newly acquired firearms. It has objective standards—it imposes a uniform 72-hour delay unless the sale falls within any expressly described exception and does not require government officials to exercise discretion. As with public carry licensing laws, then, the law does not run afoul of the Second Amendment.[10]

---

[7] In support of their argument that the plain text of the Second Amendment applies to Maine's waiting period law, plaintiffs cite *United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024). There, though, criminal defendants, as a condition of pretrial release, were barred from possessing firearms pending trial. *Id.* at 1171. It is hardly surprising, then, that the court held that what it referred to as a "temporary disarmament" implicated the plain text of the Second Amendment.

[8] Under a "shall-issue" licensing regime, no showing beyond a general desire for self-defense need be made to obtain a public carry license.

[9] That the Supreme Court seemingly approved of states requiring applicants to pass a firearm safety course before being allowed to carry a handgun in public belies plaintiffs' suggestion that states cannot presume that a person will act irresponsibly with a firearm. PI Brief, 18. There are likely many people who do not need to take a course to safely handle a firearm, but states can nevertheless impose that requirement to increase the likelihood that every person knows how to do so. Similarly, not everyone who purchases a firearm is going to act impulsively with it, but the waiting period increases the likelihood that a person will not do so.

[10] The Supreme Court noted that "because any permitting scheme can be put toward abusive ends," it was "not rul[ing] out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9. Maine's

In cases challenging laws regulating firearm sales (including waiting period laws), numerous courts have recognized that the Second Amendment's plain text does not apply to the purchase of firearms, or at least not the immediate purchase of firearms. *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024) ("The plain text of the Second Amendment directly protects one thing—the right to 'keep and bear' firearms. On its face, that language says nothing about commerce. . . ."); *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("The plain text covers plaintiffs' right 'to keep and bear arms.' And on its face 'keep and bear' does not include purchase—let alone without background check.") (citation omitted); *Mills v. New York City*, No. 23-CV-07460 (JSR), 2024 WL 4979387, at *9 (S.D.N.Y. Dec. 4, 2024) ("[N]othing in the text of the Second Amendment suggests that plaintiffs have a right to immediately obtain firearms 'on demand' as opposed to having to wait a short period of time."); *Vermont Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at *22 ("The Court concludes that the 'right of the people to keep and bear Arms,' does not facially include a right to immediately obtain a firearm through a commercial sale.") (citation omitted); *Ortega v. Lujan Grisham*, No. CIV 24-0471 JB/SCY, 2024 WL 3495314, at *26 (D.N.M. July 22, 2024) ("Having considered the normal and ordinary meaning of the Second Amendment's language, the Court agrees with the Defendants that the Second Amendment's plain text does not cover purchasing firearms.") (cleaned up); *Knight v. City of New York*, No. 22-CV-3215 (VEC) (VF), 2024 WL 1126309, at *6 (S.D.N.Y. Jan. 17, 2024) ("[B]ecause the requirement does not prevent a person from keeping or bearing arms, the 90-day waiting period does not infringe on core conduct protected by the Second Amendment."), *report and recommendation adopted in part*, 2024 WL 1096991 (S.D.N.Y. Mar. 13, 2024); *Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1132 (D. Colo. 2023) ("From this reading

waiting period law imposes only a 72-hour wait time, does not impose fees, and is not otherwise being put to "abusive ends."

of the [Second Amendment's] plain text, it is clear the relevant conduct impacted by the waiting

period—the receipt of a paid-for firearm without delay—is not covered.").

That the Second Amendment's plain text does not apply to the purchase of firearms is

reinforced by the Supreme Court's statements that regulations on commercial sales are

presumptively valid. In *Heller*, where the Supreme Court first recognized that the Second

Amendment confers an individual right to keep and bear arms, the Court cautioned that the right

is not "unlimited," and clarified that

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions
> on the possession of firearms by felons and the mentally ill, or laws forbidding the
> carrying of firearms in sensitive places such as schools and government buildings,
> or <u>laws imposing conditions and qualifications on the commercial sale of arms</u>.

554 U.S. at 626-27 (emphasis added). Such measures, the Court explained, are "presumptively

lawful regulatory measures." *Id*. at 627 n.26. Two years later, the Supreme Court "repeat[ed]

those assurances" and affirmed that *Heller's* holding "did not cast doubt" on "longstanding

regulatory measures," including "laws imposing conditions and qualifications on the commercial

sale of arms." *McDonald*, 561 U.S. at 786. In his concurrence in *Bruen*, Justice Kavanaugh

reiterated that, "properly interpreted," the Second Amendment "allows a 'variety' of gun

regulations," and "'laws imposing conditions and qualifications on the commercial sale of arms'"

are "'presumptively lawful regulatory measures.'" 597 U.S. at 80-81 (Kavanaugh, J., concurring)

(quoting *Heller*, 554 U.S. at 626-27 & n.26). Most recently, in his concurrence in *United States v.*

*Rahimi*, 602 U.S. 680 (2024), Justice Kavanaugh again noted that under *Heller* and *McDonald*,

"laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively

constitutional." *Id*. at 735 (Kavanaugh, J., concurring). There is no reason to doubt, then, that the

Supreme Court continues to recognize that regulations on the commercial sale of firearms are

presumptively lawful.

Lower federal courts have applied this presumption in challenges to laws regulating the sale of firearms. In *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024), plaintiffs challenged a law establishing 21 as the minimum age to purchase firearms. The Tenth Circuit upheld the law, explaining that "''embedded within the quartet of recent Supreme Court Second Amendment cases is the recognition that certain 'longstanding' regulations – including 'laws imposing conditions and qualifications on the commercial sale of arms' – are 'presumptively lawful.''" *Id.* (quoting *Heller*, 554 U.S. at 626–27 & n.26). Similarly, in a case challenging a law prohibiting firearm sales on state property, the Ninth Circuit concluded that the "most reasonable interpretation" of *Heller's* statement that regulations on the commercial sale of arms are presumptively lawful "is that commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test." *B & L Prods.*, 104 F.4th at 119.

Several courts have applied this presumption to waiting period laws. *See Ortega*, 2024 WL 3495314, at *30 ("Accordingly, if a firearm regulation falls into one of the presumptively Constitutional categories that *Heller* outlines, the regulation does not implicate the Second Amendment's plain text, and, thus, a court need not proceed to *Bruen's* second prong.");[11] *Rocky Mountain Gun Owners*, 701 F. Supp. 3d at 1135 (explaining that its conclusion that the plain text of the Second Amendment does not apply to a waiting period law was "reinforced" by the presumption that commercial regulations of the sale of firearms are lawful).

Theoretically, regulations on firearm sales could be so burdensome that they effectively prohibit the acquisition of firearms and interfere with the right to keep and bear arms, thus

---

[11] The *Ortega* court concluded that a law regulating the commercial sale of firearms must be "longstanding" to be entitled to the presumption. 2024 WL 3495314, at *32. This is a misreading of the relevant language in *Heller*. There, the Supreme Court was characterizing certain categories of firearm regulations as being longstanding prohibitions, not saying that a particular law within one of those categories had to be longstanding to be presumed lawful. In any event, the *Ortega* court found that waiting period laws are sufficiently longstanding. *Id.* at *34.

overcoming any presumption of lawfulness. *Bruen*, 597 U.S. at 38 n.9 (referring to permitting scheme that could be put toward "abusive ends" to "deny ordinary citizens their right to public carry"); *McRorey*, 99 F.4th at 838 n.18 ("There is no question that regulations on purchase so burdensome that they act as de facto prohibitions on acquisition would be subject to constitutional challenge under *Bruen's* rigorous historical requirement."); *Rocky Mountain Gun Owners*, 701 F. Supp. 3d at 1136 n.11 (the presumption of lawfulness is "not a guarantee," and "[a]busive regulations may still be subject to constitutional challenges").  The Attorney General is thus not suggesting that a law establishing, for example, a 25-year waiting period would withstand a Second Amendment challenge simply because it could be characterized as a "law[] imposing conditions and qualifications on the commercial sale of arms."  *Heller*, 554 U.S. at 626-27.

But a law requiring certain buyers to wait 72 hours before taking possession of a firearm is neither abusive nor a de facto prohibition on keeping and bearing arms.  *See Ortega*, 2024 WL 3495314, at *29 (concluding that a seven-day waiting period was "minimally burdensome" and did "not so substantially impinge the ability to acquire firearms that it functions as a de facto prohibition on the right to keep and bear arms"); *Vermont Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at *23 (finding that 72-hour waiting period did not unduly burden the right to keep and bear arms and noting that Second Circuit has suggested that "thirty-day waiting periods are not unconstitutionally long").  As plaintiffs concede, federal law already can delay a firearm sale for up to three days pending completion of a background check.  PI Brief, 13 (citing 18 U.S.C. § 922(t)(1)(B)(ii)).[12]  The Maine statute explicitly provides that the 72 hours "must be concurrent with any waiting period imposed by any background check process required by federal or state law." 25 M.R.S. § 2016(2).  In some instances, then, Maine's law will impose no additional delay.

---

[12]  Under the Bipartisan Safer Communities Act enacted in 2022, Pub. L. 117-159, the allowance for a background check for persons under 21 is up to ten business days.  18 U.S.C. § 922(t)(1)(C).

The Maine law imposes objective and definite standards.  With the exception of certain sales expressly identified in the statute, buyers must wait 72 hours before taking possession of a firearm.  The statute allows for no exercise of discretion—so, for example, a government official cannot extend or shorten the waiting period for a particular person.  *See Polis*, 121 F.4th at 123 (a state's "minimum age requirement for firearm sales and purchases is nondiscretionary because it sets a narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers, eliminating any possibility for subjective interpretation or exceptions").  There is thus no potential for abuse.

In sum, the Second Amendment, on its face, does not apply to Maine's 72-hour waiting period law, nor does the law impose such a burden as to interfere with what the Second Amendment does protect—the right to keep and bear arms.

### B.  Maine's waiting period law is consistent with the Nation's historical tradition of firearm regulation.

Even when the Second Amendment's plain text applies to the conduct at issue, a firearm regulation survives a Second Amendment challenge if the government "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.  The *Bruen* Court emphasized that this inquiry will sometimes be straightforward, but "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Id*. at 27.  "[T]he Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."  *Id*. at 28.  Often, the historical inquiry will "involve reasoning by analogy" and may require a determination of "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation."  *Id*. at 28-29.  This "analogical reasoning requires only that the government identify a well-established and representative historical <u>analogue</u>, not a historical <u>twin</u>.  So even if a modern-day regulation is not

11

a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. at 30 (emphasis in original).

In 2024, the Supreme Court clarified how courts should conduct this historical inquiry. *Rahimi*, 602 U.S. 680. The Court noted that it did not mean to suggest "a law trapped in amber," and that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id*. at 691-92. "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id*. at 692. "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id*. The central questions are why and how the regulation at issue burdens Second Amendment rights:

> For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster."

*Id.* (quoting *Bruen*, 597 U.S. at 30).

Maine's waiting period law addresses a societal problem that did not exist at our founding—the impulsive use of firearms to commit homicides and suicides. As Professor Randolph Roth explains, homicide rates were low in the colonial era, and even though household ownership of firearms was widespread, only ten to fifteen percent of family, household, and intimate partner homicides were committed with firearms. Roth Decl., ¶ 16. Professor Roth attributes this low rate to the technological limitations of firearms of that period—they were liable to misfire, usually had to be reloaded after every shot, reloading was time-consuming, and firearms

could not be kept loaded for any length of time. *Id.*, ¶ 17. "[C]olonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training." *Id.*, ¶ 19. So, "[g]uns were not the weapons of choice in homicides that grew out of the tensions of daily life." *Id.*, ¶ 18. By the 1820s, homicide rates remained low, and because people continued to generally refrain from going about armed, only a small percentage of homicides were committed with firearms. *Id.*, ¶ 21.

Suicide rates were also low at the founding, and suicide by firearm was rare. After analyzing suicides in Vermont and New Hampshire from 1783 to 1824, Professor Roth determined that the suicide rate was between 3.1 and 5.7 per 100,000 persons ages 16 and older, and that only six percent of suicides were committed with firearms (despite the fact that 50–60 percent of households owned a firearm). *Id.*, ¶ 43. By the late 1920s and early 1930s, though, when technology had advanced and firearms could be kept loaded and used impulsively, not only did suicide rates increase, but so did the percentage of suicides committed with firearms—41 percent in New Hampshire, 47 percent in Vermont, and 40 percent in Maine. *Id.*, ¶ 44. In sum, impulsive firearm homicides and suicides were simply not the societal problem that they are now.

Another significant difference between now and then is that, as Professor Robert Spitzer explains, firearms were not readily available during the 17th, 18th, and most of the 19th centuries. Spitzer Decl., ¶¶ 9-10. Rather, "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." *Id.*, ¶ 10. Professor John Donohue concurs with Professor Spitzer:

> There was a built-in waiting period for everyone who purchased a gun in 1791 because of issues of travel time, scarcity of gun parts, and the time it took to make a gun. The world today allows almost unlimited access to weaponry within minutes

because there are far more licensed gun sellers than the combined number of McDonald's and Starbuck's stores.

Donohue Decl., ¶ 51. *See also Vermont Fed'n of Sportsmen's Clubs*, 2024 WL 3466482, at *27 ("There is substantial evidence in the record highlighting that instant availability of a wide variety of guns would not have been anticipated at the founding."). There was thus no need to impose waiting periods until recent times because, as a practical matter, a person necessarily had to wait before taking possession of a firearm.[13]

While impulsive firearm purchasing was not a problem, other impulsive behavior was. As Professor Spitzer details, there were many laws in early America designed to keep firearms out of the hands of intoxicated individuals. Spitzer Decl., ¶¶ 14-31. From the 1600s through the early 1900s, laws in at least twenty states criminalized the carrying or use of firearms when intoxicated; laws in at least fifteen states regulated the commercial sale or distribution of alcohol when firearms were also present; and laws in at least two states barred gun sales to those who were intoxicated. *Id.*, ¶ 20.

In addition, this country has a long history of weapon licensing and permitting. *Id.*, ¶¶ 32-63. Licensing and permitting laws date to the 1600s and became more widespread in the 1800s and early 1900s. *Id.*, ¶ 34. In the 1800s, laws in at least 18 states imposed licensing requirements as a pre-requisite for carrying or owning weapons, and laws in 29 states did so in the early 1900s. *Id.*, ¶¶ 35, 41. "Historic weapons licensing laws contemplated an evaluation process to improve the likelihood that individuals who sought access to firearms did not obtain that access until they

---

[13] Plaintiffs note that in *Silvester v. Harris*, 41 F. Supp. 3d 927, 962 (E.D. Cal. 2014), the court stated that there is no historical evidence "to suggest that waiting periods imposed by the government would have been accepted and understood to be permissible under the Second Amendment." PI Brief, 10-11. But the Ninth Circuit reversed the district court and upheld California's ten-day waiting period. *Silvester*, 843 F.3d at 819. In so doing, it noted that "[t]here is . . . nothing new in having to wait for the delivery of a weapon" because "[b]efore the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one." *Id.* at 827. So while "[d]elays of a week or more were not the product of governmental regulations, . . . such delays had to be routinely accepted as part of doing business." *Id.*

were approved to receive a license." *Id.*, ¶ 75.  And as Professor Spitzer notes, "licensing by its nature thwarts any unrestricted ability to acquire or use firearms on demand." *Id.*, ¶ 33.

Given that firearm homicides and suicides were relatively rare in our Nation's history, and because firearms were not readily available until the late 19th century, it is not surprising that there are no early examples of waiting period laws.  Rather, it is "unprecedented societal concerns" (the increased use of firearms in homicides and suicides) and "dramatic technological changes" (the ability to quickly acquire firearms and easily use them) that call for the imposition of waiting periods. *See Bruen*, 597 U.S. at 27.  In this circumstance, then, the Court should apply a "nuanced" approach and look for historical analogues by comparing the "how" and "why" of Maine's waiting period law to historical precursors.

In three recent cases—in Colorado, Vermont, and New Mexico—federal courts held that waiting period laws are consistent with the Nation's historical tradition of firearm regulation.  In *Polis*, the federal district court in Colorado found that "firearms were not as readily available for purchase and . . . impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed," so "it is logical that waiting-period laws were not adopted during that period.  701 F. Supp. 3d at 1141.  The court then determined that laws restricting firearm acquisition and use by intoxicated persons were an appropriate analogue because "the Waiting-Period Act and the intoxication laws both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm." *Id.* at 1144.  The court further found that licensing laws were an appropriate analogue "because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens." *Id.* at 1145.  The court concluded

"that our Nation's historical tradition of firearm regulation is consistent with the Waiting-Period Act." *Id*. at 1145-46.

The Vermont federal court reached the same conclusion in V*ermont Federation of Sportsmen's Clubs*, 2024 WL 3466482. It agreed that "immediate availability of firearms is a modern development that requires modern regulation" and that a "nuanced approach" was necessary. *Id*. at *25; *see also id*. at *27 (explaining that "the rapid availability of guns presents an 'unprecedented social concern' that requires a 'more nuanced approach' to historical analogy"). It found that

> restrictions on firearm use associated with alcohol are an apt historical analogue for Vermont's waiting period. In both cases, the relevant legislature identifies a period during which it believes that firearms pose an extreme risk to public safety. It then mandates that individuals refrain from carrying or using firearms until those people can exercise their Second Amendment rights safely and effectively. Vermont's statute operates in a manner that finds precedence in our nation's history and tradition of gun regulation.

*Id*. at *26. As the court noted, "[t]he only difference between the two laws is the reason why the individual might make a reckless decision: one based upon alcohol, and one based upon inflamed passions or fears." *Id*. And, as in *Polis*, the court found that historical licensing laws were also appropriate analogues to a waiting period law because "[b]oth allow for background checks and mandate delay so the government can ensure that the individuals acquiring firearms are, in fact, law-abiding and responsible citizens." *Id*. The court concluded that, while a waiting period law is "a novel solution to a novel problem," it is consistent with the Nation's historical tradition of firearm regulation because of the precedent for regulations disarming "individuals who might be likely to make rash decisions with a firearm." *Id*. at 28.

Finally, in *Ortega*, 2024 WL 3495314, the federal district court in New Mexico found that waiting period laws are consistent with the historical regulation of firearms. Rather than focusing

on laws relating to intoxication and licensing, the court considered "regulations demonstrate[ing] a deeply rooted historical tradition of restricting and even outright prohibiting the sale of firearms to large groups out of a fear that some among those groups might use those firearms to do harm in society." *Id*. at *36-38.[14]

As these cases demonstrate, "how and why" Maine's waiting period law burdens Second Amendment rights (assuming for the sake of argument that the Second Amendment even applies), is the same as the "how and why" of intoxication and licensing laws.  With respect to "how," Maine's law imposes only a minor burden.  It does not apply to sales for which no background check is required, and not all firearm purchases require a background check.[15]  The law does not prohibit anyone from acquiring a firearm.  Instead, it simply imposes on covered sales a modest 72-hour waiting period.  Intoxication and licensing laws imposed a similarly minor burden. Intoxication laws simply prevented acquiring, carrying, or using firearms during the period of intoxication.  Licensing laws imposed a delay until licensing authorities could be certain that the relevant criteria were met.  In sum, the waiting period law imposes no more of a burden than early intoxication and licensing laws.

As to "why," the purpose of the waiting period law is to decrease the likelihood that firearm purchasers act irresponsibly by using firearms to harm themselves or others.  Laws prohibiting intoxicated persons from acquiring or carrying firearms were similarly designed to reduce firearm violence by persons who might act impulsively.  Licensing laws served a similar purpose—helping

---

[14] Plaintiffs argued that such laws cannot serve as analogues because they were "rooted in racism and bias." *Ortega*, 2024 WL 3495314, at *40.  The *Ortega* court rightly acknowledged that "[m]any founding-era gun regulations . . . undoubtedly are repugnant," but nevertheless concluded that it had to consider them "if it is to adhere faithfully to the Supreme Court's instruction to assess the Constitutionality of modern firearm regulations against those laws in existence in the eighteenth and early nineteenth century." *Id*.
[15] Plaintiffs are thus wrong when they say that the Maine law "applies to all firearm sales."  PI Brief, 9.

to ensure that persons acquiring firearms were responsible citizens who would be less likely to use firearms unlawfully.

In short, because both the "how" and the "why" are the same, Maine's modern waiting period law is sufficiently analogous to intoxication and licensing laws and is consistent with "this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.

## II. The remaining factors warrant denying injunctive relief.

Because plaintiffs are unlikely to prevail on the merits, the remaining factors are "matters of idle curiosity."  *New Comm Wireless Servs.*, 287 F.3d at 9.  In any event, though, the other factors do not support plaintiffs' request for injunctive relief.

Plaintiffs argue that the irreparable injury here is the deprivation of their Second Amendment rights.  PI Brief, 18-19.  But as argued above, plaintiffs are not likely to establish that the waiting period law violates the Second Amendment and thus fail to show a likelihood of irreparable injury.  *See Crosspoint Church v. Makin*, 719 F. Supp. 3d 99, 125 (D. Me. 2024). Plaintiff Beckwith claims that she and the women she helps will suffer irreparable harm because they are being denied the ability to defend themselves.  But she already carries a gun.  Beckwith Decl., ¶ 2.  While she expressed interest in purchasing another gun, *id*., she presumably has done so by now, and, if she has not, the 72-hour waiting period could not have been the reason.   She offers no support for the proposition that she has standing to allege harm to people with whom she works.  In any event, the Maine Coalition to End Domestic Violence testified that services are available to keep victims safe during the waiting period.  Stark Test. (Ex. 12).

The firearm-dealer plaintiffs claim in their declarations that business has decreased since the waiting period law went into effect.  *See* White, Hendsbee, and Cole Decls.  As an initial matter, plaintiffs offer no support for the proposition that the Second Amendment confers on gun

sellers a right to make money. So even if they are suffering a harm, it is not a harm resulting from a violation of their Second Amendment rights.[16] Because they do not claim an injury based on their Second Amendment rights, it is not clear how the firearm-dealer plaintiffs have established their standing to bring this action.

As to the remaining factors, the balancing of the equities and the analysis of the public interest should be considered together, because these two factors merge when the government is the defendant. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). And here, those factors warrant denying preliminary injunctive relief. As Professor Donohue explains:

> Substantial empirical evidence illustrates that waiting periods prior to the purchase of weapons such as those enacted by Maine will reduce suicides – particularly among young adults – and would be expected to reduce the risk of the type of episodes seen in recent years of enraged individuals buying firearms on the way to commit mass violence and other criminal acts.

Donohue Decl., ¶ 27. One study concluded that waiting period laws reduce firearm suicides by 7.4 percent—the same reduction in Maine's 158 firearm suicides in 2021 would have saved twelve lives that year alone. *Id.*, ¶ 40. Professor Donohue's own research found that waiting period laws "are able to disrupt suicidal ideation and thereby significantly decrease firearm suicides," and reduce suicides by 21-34-year olds by 6.1 percent. *Id.*, ¶ 41. As he notes, "[i]f a particularly lethal mechanism like a gun is readily available, many despondent individuals with what could be a merely passing moment of despair will end up committing suicide when a lapse of time would be enough to dissuade or divert them from such an irreversible action." *Id.*, ¶ 43. Professor Donohue further opines that waiting periods may reduce the risk of at least some mass shootings, citing as an example a 21-year old who shot and killed eight people in Atlanta in 2021. *Id.*, ¶ 47. He bought the firearm on the day of the shooting after his parents had just thrown him out of the home, and a

---

[16] Moreover, the law has been in effect for just a few months, and it is premature to conclude that it will negatively affect business in the long run.

waiting period could have allowed his immediate mental health crisis to pass. *Id.*; *see also Handgun waiting periods reduce gun deaths*, Luca, M., *et al.* (Ex. 9) (study concluding that states adopting waiting periods experienced a seventeen percent decrease in homicides and a six percent decrease in suicides).

While plaintiffs claim that the waiting period law "puts domestic violence victims and others at profound risk," PI Brief, 20, they offer no supporting evidence. Professor Donohue, by contrast, points to "empirical evidence indicat[ing] that increased gun carrying by the untrained public rarely generates any benefit in thwarting crime and is indeed self-defeating since it generates substantial increases in violent crime." Donohue Decl., ¶ 29. He notes that despite the fact that there are 350 million firearms in the United States, firearms are used in self-defense in approximately just 0.8 percent of attacks. *Id.*, ¶ 48.[17]

Finally, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (cleaned up). As shown above, the State would be harmed by enjoining this law.

## Conclusion

For the reasons set forth above, the Attorney General respectfully requests that plaintiffs' motion for preliminary injunction be denied.

---

[17] While plaintiffs claim that "in Wisconsin, a woman was killed by her stalker before she could take possession of the handgun she was attempting to purchase," PI Brief, 12, Professor Donohue explains why this claim is "improbable." Donohue Decl., ¶ 53.

Dated: January 3, 2025                    Respectfully submitted,

                                          AARON M. FREY
                                          Attorney General


                                          /s/ Christopher C. Taub
                                          CHRISTOPHER C. TAUB
                                          Chief Deputy Attorney General
                                          christopher.c.taub@maine.gov


                                          THOMAS A. KNOWLTON
                                          Deputy Attorney General
                                          Chief, Litigation Division
                                          thomas.a.knowlton@maine.gov

                                          PAUL SUITTER
                                          Assistant Attorney General
                                          Paul.suitter@maine.gov

                                          Office of the Maine Attorney General
                                          6 State House Station
                                          Augusta ME  04333-0006
                                          Tel.  (207) 626-8880
                                          Fax (207) 287-3145

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2025, I electronically filed this document and any attachments with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered participants as identified in the CM/ECF electronic filing system for this matter.

Dated:  January 3, 2025

/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Chief Deputy Attorney General

Office of the Attorney General
6 State House Station
Augusta ME  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145
christopher.c.taub@maine.gov