# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

ANDREA BECKWITH, *et al*.,                    )
                                              )
      Plaintiffs,                        )
                                              )
      v.                                 )    Civil Action No. 1:24-cv-00384-LEW
                                              )
AARON FREY, in his personal capacity          )
and in his official capacity as Attorney      )
General of Maine,                             )
                                              )
      Defendant.                         )

---

## DECLARATION OF ROBERT SPITZER

I, Dr. Robert Spitzer, declare under the penalty of perjury that the following is true and correct:

The Office of the Maine Attorney General has asked me to provide an expert opinion pertaining to firearms waiting periods and related restrictions in the United States in the above-captioned matter. This expert report and declaration ("Declaration") provides that opinion and is based on my own personal knowledge and experience; if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

### BACKGROUND AND QUALIFICATIONS

1. I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years. I am currently an adjunct professor at the College of William & Mary School of Law. I earned my Ph.D. in Government from Cornell University. I reside in Williamsburg, Virginia.

2.      I am the author of 16 books on many American politics subjects, including six on gun policy. I have been studying and writing about gun policy for nearly forty years. My first publication on the subject appeared in 1985.[1] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control*, has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The ninth edition of the book was recently published by Routledge Publishers (2024). My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws, a subject I have been studying and writing on for over ten years.  I am frequently interviewed and quoted in the national and international media on gun-related matters. For nearly thirty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence).

3.      I have provided written testimony as an expert witness in the following cases (in addition to this case): *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.); *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, No. 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, No. 17-cv-00746 (C.D. Cal.); *Gates v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Twp.*, No. 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *Nat'l Ass'n for Gun Rights, Inc.*

---

[1] Robert J. Spitzer, "Shooting Down Gun Myths," *America* (June 8, 1985), 468–69.

*v. City of Highland Park*, No. 22-cv-4774 (N.D. Ill.); *Nat'l Ass'n for Gun Rights v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott v. Connor*, No. 20-00360 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, No. 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, No. 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dept. of Safety and Homeland Sec.*, No. 1:22-cv-00951 (D. Del.); *Fitz v. Rosenblum*, No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 3:23-cv-00141 (S.D. Ill.); *Mitchell v. Atkins*, No. 19-cv-5106 (W.D. Wash.); *Keneally v. Raoul*, No. 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, No. 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, No. 22-cv-10989 (S.D.N.Y.); *Rocky Mountain Gun Owners v. The Town of Superior*, No. 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, No. 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, No. 23-cv-209-RJD (S.D. Ill.); *Fed. Firearms Licensees of Illinois v. Pritzker*, No. 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, No. 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, No. 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, No. 23-cv-05364 (W.D. Wash.); *Koppel v. Bonta*, No. 8:23-cv-00813 (C.D. Cal.); *Doe v. Bonta*, No. 8:23-cv-01324 (C.D. Cal.); *Calce v. City of New York*, No. 1:21-cv-08208-ER (S.D.N.Y.); *D.B. v. Sullivan*, No. 22-CV-282 (MAD)(CFH) (N.D.N.Y.); *Richey v. Sullivan*, No. 1:23-cv-344 (AMN-DJS) (N.D.N.Y.); *Commonwealth of Pennsylvania v. Tomlinson*, No. CP-31-CR-217-2023 (Pa. Court of Common Pleas); *Nat'l Ass'n for Gun Rights v. Polis*, No. 1:2024-cv-00001 (D. Colo.); *O'Neil v. Neronha*, No. 1:23-cv-00070 (D. RI); *State of Washington v. Gator's Custom Guns* (Cowlitz County Superior Court Case No. 23-2-00897-08); *Guardian Arms, LLC,*

*et al. v. State of WA, et al.*, No.: 23-2-01761-34; *Virginia Citizens Defense League et al. v. City of Roanoke et al.*, CL-2474; *Garcia v. Polis*, No. 1:23-cv-02563-JLK (D. Colo.); *Rocky Mountain Gun Owners v. Polis*, No.: 1:23-cv-1077-PAB-NRN (D. Colo.); *Ortega v. Lujan Grisham*, No. 1:24-cv-00471-JB-SCY (D. N.M.); *Vermont Federation of Sportsmen's Clubs v. Birmingham*, No. 2:23-cv-00710-WKS (D. Vt.); *Yzaguirre v. District of Columbia*, 24-cv-01828 (D.D.C.); *Clemendor v. District of Columbia*, 24-cv-01955 (D.D.C); *State of New Jersey v. Fox*, Docket No. FO-14-123-20, FO-14-141-21; *State of New Jersey v. Ricciardi*, Docket No. FO-14-54-21, FO-14-149-22, DOL Nos. 24-01899, 24-01900; *Birney et al., v. Delaware Department of Safety and Homeland Security, et al.* (C.A. No. K23C-07-019 RLG).

4.      I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, 319 F.3d 1185 (9th Cir. 2003); *Republic of Iraq v. Beaty*, 556 U.S. 848 (2009); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Ezell v. Chicago*, 651 F.3d 684 (7th Cir. 2011); and *People of the State of Illinois v. Aguilar*, Illinois Supreme Court, No. 08 CR 12069 (2012).

5.      I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

6.      A true and correct copy of my current curriculum vitae is attached as Exhibit A to this Declaration.

## RETENTION AND COMPENSATION

7.      I have been retained by the Office of the Attorney General of Maine to render expert opinions in this case. I am being compensated at a rate of $500 per hour for record review and consultation, document preparation, and other non-testimony services, and $750 per hour for deposition and trial testimony. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

## OPINIONS

### I.     GUN PURCHASE WAITING PERIODS

8.      Gun purchase waiting periods and related background checks as they are understood and implemented today did not exist early in the country's history. Yet no special wisdom is required to discern why. Three important differences between early America and the modern era explain why.

9.      First, in the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers,[2] private sales, gun shows, and through internet sales. This modern sales system was key to the enactment of waiting periods. No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. In the eighteenth century and before, the vast majority of firearms available in American were European imports. Among American gunsmiths, according to early American historian Brian DeLay, most American gunsmith work consisted of repair work, not the construction of firearms from scratch.

---

[2] As of 2022, there were nearly 78,000 licensed gun dealers. "Gun Dealers in the United States," Everytown for Gun Safety, https://everytownresearch.org/wp-content/uploads/sites/4/2021/05/Inside-the-Gun-Shop-One-Pager.pdf

Moreover, for the few that did manufacture firearms from start to finish, "it would have taken an early American gunsmith around a week of work to produce a basic, utilitarian longarm from scratch."[3] According to DeLay, "repairs consumed the vast majority of [their] work. . . ."[4]

10.    Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get. As Kennett and Anderson note, "By the 1880s gunmaking had completed the transition from craft to industry."[5] The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors.[6] When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry and other restrictions in the late 1800s and early 1900s.[7]

11.    Second, no organized system of gun waiting periods and background checking could feasibly exist until the modern era. In fact, the contemporary uniform federal background check system with a five business day waiting period was established by the Brady Handgun Violence Prevention Act in 1993. The waiting period was phased out in 1998 and replaced with

---

[3] Brian DeLay, "The Myth of Continuity in American Gun Culture," *California Law Review* 113(forthcoming 2025): 71; available at SSRN: https://ssrn.com/abstract=4546050 or http://dx.doi.org/10.2139/ssrn.4546050. The lengthy and painstaking process of producing a long gun from start to finish utilizing eighteenth century materials and methods is carefully chronicled in the hour-long film, "Gunsmith of Williamsburg," produced by Colonial Williamsburg, narrated by NBC reporter David Brinkley, 1969; https://www.youtube.com/watch?v=X_O1-chxAdk The film reports that the process to construct one long gun took 300 hours.
[4] DeLay, "The Myth of Continuity in American Gun Culture," 72.
[5] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 97.
[6] Kennett and Anderson, *The Gun in America,* 99-100. Sears ended handgun catalog sales in 1924, and other companies followed as pressure for government intervention rose. (194)
[7] Robert J. Spitzer, "Gun History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80(2017): 59-60, 63-67.

an instant background check system. No such system was operational when the law was passed, but bill supporters accepted the waiting period phase-out as part of the compromise to win passage of the bill.[8] As of this writing, 13 states plus D.C. have waiting period laws for at least some firearm purchases ranging in length from three to 30 days.[9] By its nature, a gun waiting period simply delays an otherwise lawful purchase for two sound reasons: to complete a proper background check to insure that the individual is not among those not qualified to have a gun; and to provide a cooling off period for those who seek to obtain a gun impulsively for homicidal or suicidal reasons.[10]

12.    Third, as historian Randall Roth reports, homicide rates in the colonies and early Federal era were generally low, and when homicides occurred, guns were seldom used because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. More specifically, muzzle loading firearms were problematic as implements for murder: they did not lend themselves to impulsive use unless already loaded (and it was generally unwise to leave them loaded for extended periods because their firing reliability degraded over time). Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict.[11]

---

[8] 107 Stat. 1536. Robert J. Spitzer, *The Politics of Gun Control,* 9th ed. (NY: Routledge, 2024), 221-28.

[9] "Waiting Periods," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/waiting-periods/. In 2023 Minnesota enacted a law that provides for a 30 day waiting period for the purchase of handguns and assault weapon purchases from dealers.

[10] E.g. Michael Luca, Deepak Malhotra, and Christopher Poliquin, "Handgun waiting periods reduce gun deaths," *PNAS* 114(October 16, 2017): 12162-12165, https://www.pnas.org/doi/full/10.1073/pnas.1619896114.

[11] Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and

13.     Beyond these considerations, waiting periods can only exist through the interdiction of the government, or dealers, or both. Given the logical absence of historical twins to modern waiting periods in earlier American history, were there similar, analogous historical gun laws? A close examination of historical laws, ordinances, and regulations shows a long history in this country of (1) temporarily restricting or regulating weapons access based on assumptions about risks posed by an individual's perceived mental condition with respect to alcohol intoxication, and (2) enacting and enforcing licensing/permitting laws, which by their nature incorporated the passage of time between the attempt by individuals to acquire or use weapons and the granting of permission by the government to then do so. The Plaintiffs' Complaint in this case asserts that "[t]here is no longstanding tradition in this country of forcing law-abiding citizens to wait to acquire firearms."[12] The account below will demonstrate that this assertion is incorrect.

## II.    GUNS AND INTOXICATION

14.     An instructive and analogous historical parallel to modern waiting period laws is the intersection of historic gun laws pertaining to alcohol use and intoxication with weapons possession and use. Just as those considered mentally ill are similarly understood to reflect a kind of "diminished capacity" such that they also may be deprived of access to weapons, alcohol intoxication was a basis for preventing gun acquisition or use because it diminished capacity,

---

Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17. See also Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.

[12] Plaintiffs' Complaint, *Beckwith et al. v. Frey,* U.S. District Court for the District of Maine, Case 1:24-cv-00384-LEW, Filed 11/12/24, 24.

judgment, and reason. The effects of alcohol consumption in reducing and degrading an individual's judgment, reasoning, coordination, and skill were well understood in early America.

15.    For example, the foremost American physician of the eighteenth century, Dr. Benjamin Rush, published a highly influential and widely read tract in 1785 titled, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind*. (The phrase "ardent spirits" referred to strong distilled liquors.) In addition to his pioneering work in medicine, Rush was a signer of the Declaration of Independence, advisor to public officials including Thomas Jefferson, and a social activist. After first noting in his tract the physiological effects of inebriation and alcoholism, Rush then turned to its mental effects. "Not less destructive are the effects of ardent spirits upon the human mind. They impair the memory, debilitate the understanding, and pervert the moral faculties. . . . But the demoralizing effects of distilled spirits do not stop here. They produce not only falsehood, but fraud, theft, uncleanliness and murder."[13]

16.    It is no crime to be intoxicated from alcohol consumption—a fact no less true today than hundreds of years ago. Similarly, the purchase of alcohol for those eligible to drink is and has been perfectly legal, with the exception of the Prohibition period in the 1920s. When alcohol consumption is combined with other activities or circumstances, however, it has been and is subject to a variety of regulatory measures, including state sanctions, such as those arising from operating a motor vehicle while under the influence of alcohol. When inebriation ends, drivers may resume driving, subject to any restrictions imposed by the government for prior instances of driving while drunk, such as license suspension for a fixed period.

---

[13] Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind*, 6th ed. (NY: Cornelius Davis, 1811; first pub. 1785), 7, https://digirepo.nlm.nih.gov/ext/mhl/2569025R/PDF/2569025R.pdf

17.    That aside, the government has long imposed a wide range of regulatory measures pertaining to the adverse consequences of alcohol consumption (including but not limited to those pertaining to weapons), incorporating "pricing and taxation measures, regulating the physical availability of alcohol, restricting alcohol marketing, education and persuasion strategies, drunk-driving countermeasures, modifying the drinking context, and treatment and early intervention."[14]

18.    In the century and a half before the American Revolution, "the colonists of North America tended to regard heavy drinking as normal"[15] as such beverages "were considered important and invigorating foods, whose restorative powers were a natural blessing."[16] Reliance on alcoholic beverages was also common because of the baneful health effects of drinking contaminated water. Despite the normality of heavy drinking, drunkenness was also recognized even in this early period as a significant problem to be "condemned and punished"[17] partly for the reasons described by Benjamin Rush. Early weapons laws (see below) reflected this understanding. During this period, the adverse consequences of excessive drinking were mitigated to a significant degree because it largely occurred through community taverns where social pressures and a system of tavern licensing, dating to the 1600s, encouraged "responsible oversight"[18] by tavern owners.

---

[14] Thomas F. Babor, et al., *Alcohol: No Ordinary Commodity: Research and Public Policy,* 3rd ed. (NY: Oxford University Press, 2023), Ch. 1, p. 9.
[15] "Alcohol in America: Taking Action to Prevent Abuse," National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK217463/
[16] Paul Aaron and David Musto, "Temperance and Prohibition in America: A Historical Overview," in *Alcohol and Public Policy: Beyond the Shadow of Prohibition,* Mark H. Moore and Dean R. Gerstein, eds. (Washington, D.C.: National Academies Press, 1981), 131.
[17] Aaron and Musto, "Temperance and Prohibition in America," 132.
[18] Aaron and Musto, "Temperance and Prohibition in America," 133.

19.    The post-Revolution period, however, witnessed a dramatic change in alcohol products as cheaper and more abundant distilled spirits, like domestic whiskey, exploded in production and demand. As production and consumption skyrocketed, earlier safeguards declined, and public drunkenness became much more common.[19] Coinciding with these changes, attitudes began to change as well, as alcohol came to be thought of increasingly as "an addicting and even poisonous drug," the excessive consumption of which led to a host of familial, behavioral, social, and other problems.[20] This growing societal awareness of the adverse consequences of alcohol consumption gave rise to the temperance movement and the Anti-Saloon Leagues of the nineteenth and early twentieth centuries, culminating in the adoption of the Eighteenth (Prohibition) Amendment to the Constitution in 1919, which was then repealed by the Twenty-first Amendment in 1933.

20.    Even though attitudes about alcohol use evolved over time, laws restricting or punishing the handling, carrying, or use of firearms while intoxicated appeared among the very earliest weapons regulations in America. From the 1600s through the early 1900s, laws were enacted in at least 30 states that regulated, restricted, and punished inebriation in connection with the ownership or use of weapons. These regulations included laws enacted in at least 20 states that criminalized the carrying or use of firearms when intoxicated. At least 15 states had laws that regulated the commercial sale or distribution of alcohol when firearms were also present; at least two states barred gun sales to those who were intoxicated; at least six states enacted laws prohibiting drunkenness in connection with militia activity; and one state (Arizona) barred providing guns to Native Americans if intoxicated (see Exhibits B and C).

---

[19] Aaron and Musto, "Temperance and Prohibition in America," 134-36.
[20] "Alcohol in America"; W.J. Rorabaugh, *The Alcohol Republic* (NY: Oxford University Press, 1979), 125-46.

21.    To parse the data chronologically, in the 1600s, at least seven intoxication laws were enacted in at least three states (which at the time were colonies); in the 1700s at least nine laws were enacted in seven colonies/states; in the 1800s at least 28 laws were enacted in 19 states ; and in the 1900s at least 32 laws were enacted in 15 states (note that some states enacted laws across more than one century). As noted, a number of these measures appeared very early in the Nation's history, punctuating the country's enduring struggle with "demon rum."

22.    In 1623, 1631, and again in 1632, for example, Virginia enacted measures all directing that "[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments."[21] One presumes that the expenditure of powder pertained both to firearms discharges and perhaps to the separate ignition of gun powder. Most important, however, is that the actions under regulation were barred specifically when "drinking" was involved. In a 1655 Virginia law, alcohol-fueled revelry was subject to fines for any who would "shoot any guns at drinking," although the law carved out two special occasions for regulatory exemption: "marriages and funerals only excepted."[22] While this admittedly amusing law was prompted by concern over whether colonists would hear an alarm warning of a Native American attack, the law's enactment was necessitated by rowdy "frequent shooting of guns at drinking" which the law dubbed "beastly vice spending much powder in vaine" that could otherwise be used in fending off an attack or for other purposes. Thus, the law applied only to the intersection of shooting and drinking, not all shooting, recognizing yet again

---

[21] 1623 Va. Acts 127 Acts of March 5th, 1623, 29; 1631 Va. Acts 173, Acts of February 24th, 1631, Act L; 1632 Va. Acts 198, Acts of September 4th, 1632, Act XLIV.
[22] 1655 Va. Acts 401, Acts of March 10, 1655, Act XII. Early in the country's history, alcoholic beverages played an especially important role in marrying and burying. Eric Burns, *The Spirits of America* (Philadelphia, PA: Temple University Press, 2004), 16-17.

the early understanding that alcohol-fueled firearms use led to undesirable (and therefore prohibitory) behavior.

23.    In 1636 Rhode Island enacted a measure to punish any who would engage in "shooting out any gun . . . drinking in any tavern alehouse . . . on the first day of the week more than neccesity requireth." Any who did so would find themselves in the stocks or fined five shillings.[23] In 1663 Massachusetts criminalized any on board of ships docked at any colonial harbor where those on board would "be drunk within their vessels by day or night" and "shoot off any gun after the daylight is past, or on the sabbath day." The fine was a substantial twenty shillings for every gun so fired.[24] In 1750 Pennsylvania enacted a law "For Suppressing Idleness, Drunkenness, And Other Debaucheries" that punished with "penalties and forfeitures" any who fired guns or set off fireworks without a special license to do so.[25]

24.    Such measures proliferated in the nineteenth and early twentieth centuries, most commonly as a bar to weapons carrying or discharging. For example, the Tennessee legislature granted a locality the authority to penalize "shooting and carrying guns" along with drinking in 1825.[26] In 1868, Kansas enacted a law to punish anyone found to carry a deadly weapon while "under the influence of intoxicating drink."[27] Nevada enacted measures in 1881 and 1885 that

---

[23] 1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636.
[24] The Charters and General Laws Of The Colony And Province Of Massachusetts Bay Page 190, Image 197 (1814) available at The Making of Modern Law: Primary Sources. 1663.
[25] 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries.
[26] 1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292.
[27] *The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed* 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources.

punished anyone who discharged firearms in various public spaces while "under the influence of liquor."[28] An 1883 Wisconsin law made it "unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."[29] In 1878, 1880, and 1908, Mississippi enacted laws that made it illegal "to sell to any minor or person intoxicated" any pistol or other named weapon[30] (minors and those intoxicated were more than occasionally treated together within these laws, a clear indication of their inferior legal status[31]). In 1907, Arizona enacted a law making it "unlawful for any constable or other peace officer in the Territory of Arizona, while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm."[32]

25.    In 1879 and again in 1883, Missouri enacted a law to fine or imprison anyone who carried concealed or brandished "any kind of fire arms" or other listed weapons "when

---

[28] 1881 Nev. Stat. 19-20, An Act to Prohibit the Use of Firearms in Public Places, ch. 7, § 1; David E. Aily, *The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto* 1076, Image 1084 (1885) available at *The Making of Modern Law: Primary Sources. An Act to Prohibit the Use of Firearms in Public Places*, § 1.

[29] 1883 Wis. Sess. Laws 290.

[30] 1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3; Josiah A. Patterson Campbell, *The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes* 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources; Laws regulating carrying and brandishing firearms, who can own them, where they can be brought, etc., Ch. 20, §§ 293-300, in The Charter and Code of the Ordinances of Yazoo City (1908).

[31] E.g. William H. Bridges, *Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix* 50, Image 50 (1867) at The Making of Modern Law: Primary Sources. Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

[32] 1907 Ariz. Sess. Laws 15, An Act to Prohibit Officers from Carrying Firearms While Under the Influence of Liquor and for Other Purposes, ch. 16, § 1. Arizona became a state in 1912.

intoxicated or under the influence of intoxicating drinks."[33] At least 20 similar laws were also enacted in Missouri between 1873 and 1917 that applied to counties, cities, and towns (see Exhibits B and C).

26.     A Maryland state law from 1884 pertaining to Baltimore stated that anyone found to be "drunk or disorderly" who was also carrying a concealed pistol or other weapon was subject to confiscation of the weapon and a fine.[34] Rhode Island enacted a similar law—fine plus weapon confiscation—in 1893.[35] An 1899 South Carolina law said that "any person who shall engage in any boisterous conduct, under the influence of intoxicating liquors" who discharged a firearm of any kind near a road would be subject to a fine and jail.[36] A 1909 Idaho law criminalized anyone who "shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks."[37]

27.     While the focus of these laws was on regulating persons who had weapons while drinking or drunk, another category of laws in early America restricted the sale or distribution of alcohol in the proximity of persons with firearms. A 1679 Massachusetts law prohibited bringing or selling "any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a

---

[33] MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879); 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[34] John Prentiss Poe, *The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein* 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources. 1884.

[35] *General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State* Page 1010, Image 1026 (1896) available at The Making of Modern Law: Primary Sources. 1893.

[36] 1899 S.C. Acts 97, An Act to Prevent Drunkeness and Shooting Upon The Highway, No. 67, § 1.

[37] 1909 Id. Sess. Laws 6, § 1.

penny a-quart" on and in the proximity of militia training days unless they were licensed to do so "from the hands of two magistrates" or the commanding military officer then present.[38] In 1746, New Jersey enacted a law penalizing anyone who would "presume to sell any strong Liquor. . . in such Days or Times. . . at the Place of Mustering or Training [of militias], or within a Mile thereof. . . ."[39] Similarly, a 1756 Delaware law forbade militia companies from meeting within a half mile of any inn or tavern. It also punished any attempting to sell "any strong liquor" in a booth or tent in proximity of a militia training area.[40] Also in 1756, Maryland enacted a similar measure to penalize attempts to sell "strong liquor" at the time and location of militia musters.[41] Pennsylvania enacted the same type of measure in 1780.[42] Such measures extended into the nineteenth century.[43] These laws make abundantly clear that diminished capacity caused by

---

[38] "Order p[ro]hibbiting retayling strong drinckes at traynings," Boston, May 28th, 1679. Beer had a lower alcohol content than other alcoholic beverages.

[39] An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions. Passed May 8, 1746. Section 3. Officers and Soldiers to behave well while under Arms; and, Section 23. Penalty on selling strong Liquor near the mustering Place.

[40] An Act for Establishing a Militia in this Government (Delaware, 1756).

[41] An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756).

[42] An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (20 March, 1780), § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th rule.

[43] Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852); An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853); Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed, Acts and Resolves of Maine, Ch. 265 "An Act to Organize and Discipline the Militia," §73 (1856); 1859 Conn. Acts 62, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. In Public Acts Passed by the General Assembly of the State of Connecticut, Ch. 82, §5; Amendments to Militia Regulations, Ohio Senate Bill No. 7, § 1, in The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session (1886); Selling Liquors on Camp Grounds Prohibited, § 22 of Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia in Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa (1896).

alcohol consumption when gun carrying and use was also occurring was serious enough to proscribe the intersection of the two by law.

28.    Aside from these laws restricting the civilian commercial sale of alcohol, colonies and then states also enacted laws that directly restricted or punished drunkenness among militia ranks[44] for the obvious reason that excessive alcohol consumption undermined military order, morale, and effectiveness.[45] To be sure, alcohol was also very much a part of soldiering during this time. For example, General George Washington "insisted on alcohol for his men"[46] during the Revolutionary War, but like any good commander, he wanted to tightly control its dissemination and consumption. The normal daily alcohol ration for Washington's men was four ounces.[47]

29.    States and localities enacted similar laws in the nineteenth and twentieth centuries. A Chicago, Illinois ordinance from 1851 imposed a series of strict and wide-ranging regulations concerning licensing for the storage, transport, and handling of gun powder and gun cotton that included this prohibition: "no permit shall be granted to any retailer of intoxicating

---

[44] E.g. An Act for regulating and ordering the Troops that are, or may be raised, for the Defence of this Colony, Article 19 (11 May, 1775); An Act For the better ordering of the Militia of this Province §19 Savannah, GA (25 March, 1765); An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756); An Act to regulate the Militia of the Common-Wealth of Pennsylvania, §§ IX-X (1777); An Act for the Regulation of the Militia of this State (South Carolina) § 5 Regulations for the government of the militia, Rule 7 (1782).

[45] This concern is reflected in Frederick William Baron von Steuben, *Baron von Steuben's Revolutionary War Drill Manual* (NY: Dover Publications, 1985; first pub. 1779, rev'd. 1794), 82, 105.

[46] Burns, *The Spirits of America*, 16.

[47] Burns, *The Spirits of America,* 16. During the terrible winter at Valley Forge, Pa., of 1777-78, Washington doubled the daily alcohol ration for the men to eight ounces per day.

liquors or to any intemperate person."[48] St. Paul, Minnesota enacted a similar measure in 1858.[49] Delaware enacted laws in 1911 and 1919 that made it "unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges."[50]

30.    The whole point of these laws—to keep firearms from the hands of the intoxicated while they were in a state of intoxication—provides a remarkable parallel to the "cooling off" purpose of modern waiting period laws. The intoxicated could generally acquire or reacquire guns after they sobered up, just as in the modern era gun license applicants can acquire their guns after the "cooling off" period.

31.    Thus, "sobering up" might be thought of as the historical equivalent of "cooling off."

## III.  HISTORICAL WEAPONS LICENSING LAWS

32.    Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. By one definition, licensing is the "permission by competent authority to do an act which, without such permission, would be illegal. . . ."[51] Despite the difference of hundreds of years, licensing in early America functioned largely in the way it functions today.

33.    While different in its particulars, historical weapons licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods, in that they are predicated on

---

[48] George Manierre, *The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois* 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources.

[49] *The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City* 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858.

[50] Vol. 26 Del. Laws 28, 28- 29 (1911); Vol. 30 Del. Laws 55, 55-56 (1919).

[51] Henry C. Black, *Black's Law Dictionary*, 6th ed. (St. Paul, MN: West Publishing, 1991), 634.

a process whereby a license applicant provides or submits some kind of information which is then evaluated and judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its nature, then, licensing contemplates the passage of some period of time (even if it be brief) between the time the application for permission to do something is submitted (such as a hunting license application) and the license or permission is granted. In addition, licensing generally represented a more mature and nuanced form of regulation that in many instances succeeded or supplemented more rigid but less complicated laws (see discussion below). The same might be said of modern waiting periods, in that they are a more nuanced and sophisticated policy tool to winnow out those who might pose a threat with possession of a firearm. In addition, licensing by its nature thwarts any unrestricted ability to acquire or use firearms on demand.

34.    Colonial, state, and local laws encompassing the licensing or permitting of dangerous weapons and substances date to the 1600s and 1700s, but became more wide-ranging and widespread in the 1800s and early 1900s. These laws mostly pertained to those weapons and substances that posed a threat to public safety: concealable weapons, including handguns, fighting knives, various types of clubs, and explosives (ranging from firecrackers and gunpowder to nitroglycerine after its invention). This is consistent with what became the widespread use of licensing by the nineteenth century, which was employed "to regulate and control a host of economic activities, trades, callings, and professions" though "the overall justification for licensing was the same as the police power generally—the public good and the people's welfare." [52]

---

[52] William J. Novak, *People's Welfare: Law and Regulation in Nineteenth Century America* (Chapel, Hill, NC: University of North Carolina Press, 1996)*,* 90. For example, Bangor, Maine

35.     At least 89 licensing requirement laws were enacted in at least 34 states for individuals as a pre-requisite for their weapons carrying or ownership during this time (including Maine[53]); laws in 18 states did so in the 1800s and 29 did so in the 1900s (some states enacted laws in multiple centuries; see Exhibits D and E). Laws in at least 27 states regulated firearms discharging through licensing, with 13 of those states doing so from the 1700s up to the start of the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some states enacted laws in both periods). Laws in at least 12 states licensed hunting with firearms from the 1800s through the early 1900s. At least 20 states had laws that licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries from the 1600s through the early 1900s. Laws in at least 22 states licensed the possession, handling, or transport of gunpowder and other explosives from the 1600s through the early 1900s. Laws in at least 17 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons in the late 1800s and the early 1900s as the sales process matured and became regulated.

36.     In addition, at least 15 states imposed licensing requirements on specified marginalized groups (variously including Native Americans, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 13 states allowed for licensing of enslaved persons or free Blacks. And nine states enacted regulatory taxes on firearms.

---

enacted an ordinance in 1878 to license a variety of private activities with public consequences, including making or repairing any drains or aqueducts, the sale of various goods, the parking of commercial vehicles, activities that might block streets, and the use of explosives. Injurious Practices, §§ 27 & 28, BANGOR, CHARTER AND ORDINANCES OF THE CITY (Burr & Robinson 1878), https://firearmslaw.duke.edu/assets/1878,-me,-bangor,-injurious-practices,--27-&-28.pdf

[53] An Ordinance Relating to Concealed Weapons, §§ 1-5, reprinted in City of Portland Auditor's Fifty-First Annual Report of the Receipts and Expenditures of the City of Portland [Maine] for the Financial Year of 1909, 152-53 (1910).

37.     A great many laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were first enacted in or for municipalities (populated areas), since the misuse of weapons posed a far greater and more identifiable risk to public safety in areas where larger numbers of people lived in close proximity to each other, and because observing, monitoring, and enforcing these measures by local governments was more feasible in jurisdictions where larger numbers of people lived in more geographically defined and confined areas. Municipal laws are no less significant than state laws for three reasons: first, social and public safety problems arising from weapons typically appeared first in places where large numbers of people congregated and lived—i.e., cities and towns. These problems multiplied in the nineteenth century as the U.S. began to transition from an overwhelmingly rural nation to a majority urban one. Second, given that municipalities are legal creatures of state governments, localities' ability to enact these or other laws presumes that they did so as allowable public policy under state law. Third, the initial enactment of municipal regulations often led to subsequent enactment of similar state-wide regulations.

38.     These licensing categories were generally instances where the prevailing legal standard had been to criminalize the activity or practice outright—criminalizing concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The governing units enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a new and more mature form of government regulation of the activities in question.

39.     With regard to concealed carry of pistols and other dangerous weapons, for example, from the 1700s through the early 1900s every state in the country restricted or criminalized such carrying.[54] With the spread of licensing requirements in the post-Civil War nineteenth century, however, governing units were now allowing legal weapons carrying, subject to the review criteria as conducted by local officials who were empowered to grant carry licenses. The criteria for the granting of these licenses were generally highly discretionary for the individuals or bodies granting them. In some laws, no criteria were specified; in others, the criteria were vague or broad, but often included wording that the applicants must be persons of good character or sound judgment, again emphasizing the determinative judgment of those granting the licenses. They usually set a time limit for permits, ranging from a month to a year (see below).

40.     Regarding hunting licenses, many earlier laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[55] The hunting related laws listed here are all instances where hunting was allowed through permitting by a governing entity, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season). Licensing related to Indigenous people, enslaved persons, and free persons of color is examined in more detail below.

## A.     Licensing of Weapons Carrying or Possession

---

[54] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67; Robert J. Spitzer, "Understanding Gun Law History after *Bruen:* Moving Forward By Looking Back," *Fordham Urban Law Journal* 51(October 2023): 99-100, 105-15.

[55] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 73-74.

41.     This analysis identified 89 concealed weapons carry license laws enacted by 34 states from the post-Civil War period through the early 1900s: 35 of these laws were enacted by 18 states between the end of the Civil War and 1900, and 53 were enacted by 29 states in the early 1900s (some states enacted laws in both centuries). Generally speaking, these laws criminalized the concealed carrying of various weapons, but all of the laws examined here carved out exceptions for those who applied for, and received, a carry license. In addition, most permit laws imposed a time limit on permit duration, generally ranging from a month to a year, regardless of other criteria.

42.     Broadly speaking, these laws fell into two categories: those that specified criteria for granting a license, and those that did not: 54 of the 89 laws included discretionary criteria for the issuing of licenses, whereas the other 35 did not. Thus, about 60% of these licensing laws included discretionary criteria. Of the latter (no discretionary criteria listed) category, it is possible that criteria were specified in other laws, documents, oaths, or the like, but that were not specified in the laws enacting a weapons licensing scheme.

43.     In 1871, Missouri enacted a measure to license the otherwise illegal practice of concealed carrying of handguns and other named weapons, including "any other dangerous or deadly weapon" in St. Louis by means of "written permission from the Mayor."[56] St. Louis enacted its own municipal version of this law in 1892.[57] A similar measure was enacted for

---

[56] Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871).
[57] The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892; Chapter 18. Of Misdemeanors, Sec. 1471.

Kansas City, Missouri, in 1880.[58] Jersey City, New Jersey enacted a licensing scheme in 1871

for concealed weapons carrying of pistols and other dangerous weapons, defined in the law as

"any gun, pistol, cannon, or fowling piece or other fire-arms. . . ."[59] As this wording makes

clear, this extended to long guns as well (a fowling piece is a long-barreled shotgun for shooting

small animals[60]). Jersey City's 1873 law laid out a broadly discretionary set of criteria for

granting licenses, described below (as determined by the city's municipal court), that bears great

similarity to contemporary gun licensing schemes:

> The Municipal Court of Jersey City may grant permits to carry any of the weapons
> named in the first section to such persons as should, from the nature of their
> profession, business or occupation, or from peculiar circumstances, be allowed so
> to do; and may, in granting such permits, impose such conditions and restrictions
> in each case as to the court shall seem proper.[61]

44.    The Jersey City ordinance added that carry permits would not be granted "to any

person until the court is satisfied that such person is temperate, of adult age, and capable of

exercising self-control."[62]

45.    Hyde Park, Illinois enacted a similar licensing law for concealed weapons

carrying, including handguns, in 1876. In this instance, the licenses were granted "by written

---

[58] An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880; Chapter XXXIV. Public Safety, Sec. 3.

[59] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871.

[60] https://www.thefreedictionary.com/fowling+piece.

[61] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873.

[62] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871.

permission of the Captain of Police."[63] Evanston, Illinois's concealed carry licensing law of 1893

granted licensing issuance authority to the city mayor.[64]

46.    New York City criminalized the carrying of "a pistol of any description concealed

on his person" in 1881 but provided for a legal carry license exception:

> Any person, except as provided in this article, who has occasion to carry a pistol
> for his protection, may apply to the officer in command at the station-house of the
> precinct where he resided, and such officer, if satisfied that the applicant is a proper
> and law abiding person, shall give said person a recommendation to the
> superintendent of police, or the inspector in command at the central office in the
> absence of the superintendent, who shall issue a permit to the said person allowing
> him to carry a pistol of any description.[65]

47.    This provision also allowed for non-residents who had occasional business in the

city to apply for permits as well. An 1884 New York state law barred the carrying or possession

of named weapons, including fighting knives and types of clubs, from those under eighteen,

unless they possessed a license to do so. Licenses could only be granted for up to one year and

were subject to revocation "at the pleasure of the mayor."[66] A year later, the law was extended to

---

[63] Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with
Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and
Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of
Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments
Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876.
Misdemeanors, § 39.
[64] George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and
Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of
Modern Law: Primary Sources.
[65] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of
New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their
Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law:
Primary Sources.
[66] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of
New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern
Law: Primary Sources. 1884.

all cities in the state and included "any pistol or other firearms of any kind."[67] (This would have included long guns as it did not specify only concealed carry.) In 1891, the state extended permitting to Buffalo covering handguns and other dangerous weapons.[68]

48.     Wheeling, West Virginia enacted a law in 1881 making it "unlawful for any person to carry" various named weapons, including a "colt" revolver, or to "carry about his person, hid from common observation" any pistol or other named weapon without a permit from the mayor.[69] Under the heading "License," an 1882 law applying to St. Paul, Minnesota criminalized any concealed weapons carrying, absent such licensing.[70]

49.     An 1888 Salt Lake City, Utah ordinance barred the carrying of "any concealed weapon" unless the person obtained a permit from the city mayor.[71] New Haven, Connecticut enacted a similar anti-carry law in 1890, extending to pistols, unless the person first obtained a permit either from the mayor or police superintendent.[72] Oakland, California enacted a similar law in 1890 making it unlawful "to wear or carry concealed about his person" a pistol or other listed weapon unless the person obtained a permit from the mayor. The permit was good for up

---

[67] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources.

[68] 1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.

[69] Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206, SEC. 14. 1881.

[70] W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882.

[71] The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888), Dangerous and Concealed Weapons. SEC. 14.

[72] Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

to a year, and could be granted to "any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person."[73] The California cities of Stockton (1891)[74] and Fresno (1896)[75] did the same.

50.    A law passed by the U.S. Congress in 1892 for the District of Columbia criminalized the concealed carry of "any deadly or dangerous weapons," including pistols, unless granted a permit by a judge of the police court "for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof. . . ."[76] Florida's 1893 law made it "unlawful to carry or own a Winchester or other repeating rifle or without first taking out a license from the County Commissioner. . . ." In addition, the law specified that the applicant "shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners," along with "a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same."[77]

51.    Montana enacted a wide-ranging state licensing law in 1895 that threatened imprisonment and fines for anyone "who brings into this state an armed person or armed body of

---

[73] Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890.

[74] Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891.

[75] L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

[76] Washington D.C. 27 Stat. 116 (1892), CHAP. 159.

[77] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4.

men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor. . . ."[78]

52.　　A state law in Nebraska granted the mayor of Lincoln the authority to issue concealed carry weapons licenses good for a year "to so many and such persons as he may think proper" in 1895, adding that the mayor "may revoke any and all of such licenses at his pleasure."[79] The city of Spokane, Washington criminalized the concealed carrying of "either a revolver, pistol or other fire-arms" unless persons obtained a "special written permit from the Superior Court" to do so.[80] Milwaukee, Wisconsin enacted a permitting system in 1896 for persons to carry otherwise barred various dangerous weapons including "any pistol or colt" if the city police chief granted a license if "it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon." The chief could also "revoke such permit at any time."[81]

53.　　In the twentieth century, permitting accelerated, spread, and broadened. In 1905 New Jersey enacted a state law licensing concealed weapons carrying for a year "unless sooner revoked by the officer or body granting the same."[82] Licensing was extended to long guns—

---

[78] Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895. Crimes Against the Public Peace, § 759.

[79] 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

[80] Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895.

[81] Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. Chapter XX. Misdemeanors. Section 25.

[82] 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

machine guns and automatic rifles—in New Jersey in 1927[83] and 1934.[84] (A number of the 36 states that enacted anti-machine gun laws in the 1920s and 1930s made exceptions for possession via licensing.) In 1906 a Massachusetts state law noted that prosecution for carrying "a loaded pistol or revolver" did not apply to those with a license.[85] It extended licensing to a variety of guns in 1927.[86] In 1908 Virginia enacted a dangerous weapons concealed carry permit law, with permits granted for one year "upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon."[87] It extended the permitting process in 1926.[88]

54.    In 1909, Portland, Maine enacted a discretionary weapons concealed carry law applying to the carrying of any "fire arm, slung shot, knuckles, bowie knife, dirk, stiletto, or other dangerous or deadly weapon" unless licensed to do so by the local police. It could issue licenses

> to any person of good moral character, whose business or occupation requires the carrying of such weapons for protection, a certificate setting forth that such person has complied with the requirements of this ordinance, and that he has been duly licensed to carry such weapon or weapons for protection. Such license shall continue in effect until revoked by the Chief of Police.[89]

---

[83] 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

[84] 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

[85] 1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons.

[86] 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123).

[87] 1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780.

[88] 1926 Va. Acts. 285-87, CHAP. 158.

[89] An Ordinance Relating to Concealed Weapons, §§ 1-5, reprinted in City of Portland Auditor's Fifty-First Annual Report of the Receipts and Expenditures of the City of Portland [Maine] for the Financial Year of 1909, 152-53 (1910). ORDINANCE RELATING TO CONCEALED WEAPONS. As early as 1840, Maine criminalized the carrying of weapons (not limited to

55.    Georgia enacted a detailed handgun permitting system in 1910.[90] Thereafter, permitting was enacted in states (not including those that enacted permitting in the 1800s, most of which also enacted permitting laws in the 1900s as well) including Hawaii,[91] Indiana,[92] Michigan,[93] New Hampshire,[94] North Carolina,[95] North Dakota,[96] Ohio,[97] Oregon,[98] Pennsylvania,[99] Rhode Island,[100] and South Carolina.[101] As of 1938, "the carrying of concealed

---

concealed carrying) including "any dirk, dagger, sword, pistol, or other offensive and dangerous weapon. . . ." Maine Rev. Stat. ch. 169,  sec. 16 (1841), available at https://lldc.mainelegislature.org/Open/RS/RS1840/RS1840_c169.pdf.

[90] Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910.

[91] 1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17; 1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

[92] 1925 Ind. Acts 495, 495-98.

[93] 1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7; 1927 Mich. Pub. Acts 888-89, 91, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, §§ 3, 9.

[94] 1923 N.H. Laws 138.

[95] 1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

[96] 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5; 1923 N.D. Laws 379, 380-82 ch. 266; 1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2; 1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

[97] 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

[98] 1913 Or. Laws 497; 1917 Or. Sess. Laws 804-808; 1925 Or. Laws 468, 469-471.

[99] 1929 Pa. Laws 777; 1931 PA. Laws 498, No. 158.

[100] 1927 (January Session) R.I. Pub. Laws 256.

[101] 1934 S.C. Acts 1288.

pistols [was] either prohibited absolutely or permitted only with a license in every state but two."[102]

56.    The existence and functioning of old licensing laws make clear that the government could take whatever time was needed to complete the licensing process, consistent with its police powers. The historical realities of licensing provide no notion nor inclination that there was anything resembling a "right" to obtain or use firearms on demand. Moreover, no license law examined here imposed any time limit by which a license application had to be approved or denied by the relevant governing authority. And often, these laws gave the individual or body that granted the license to also withdraw or cancel it at his or its pleasure. If one trait of these laws emerges, it is that those granting licenses had wide-ranging discretion to issue or not issue as they saw fit, and to do so according to any time frame they saw fit.

### B.    Permits for Firearms Discharge or Use of Explosives

57.    As noted above, laws in at least 27 states established licensing mechanisms to allow firearms and like discharges under certain circumstances. Generally speaking, firearms and discharge licensing pertained to any firearm, not just handguns. From the 1700s to 1860, laws in at least 13 colonies/states assigned discharge licensing authority to local officials. The earliest were in Pennsylvania. In 1713, Philadelphia penalized various activities in the city including "firing a Gun without license."[103] An act pertaining to the entire colony from 1721 imposed "penalties and forfeitures" to anyone who engaged in various activities including firing "any gun or other fire arm" or selling or setting off various types of fireworks "without the governor's

---

[102] Sam B. Warner, *The Uniform Pistol Act*, 29 J. CRIM. L. & CRIMINOLOGY 529, 530 (1938).
[103] Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713.

special license."[104] Another Philadelphia ordinance to prevent "mischief [that] may happen by shooting of guns" or setting off fireworks, criminalized such activities unless individuals first obtained a "governor's special license."[105] A 1750 law did the same for the District of Southwark,[106] as did a colony-wide law also in 1750.[107] In 1824, permission from the president of the board of commissioners was required for anyone seeking to test through firing any gun, cannon, or similar weapons in certain sections of Philadelphia.[108]

58.    Charleston, South Carolina enacted an ordinance in 1802 similar to those of Philadelphia where Commissioners of the Streets would grant a license for gun firing and fireworks "at times of public rejoicing" and at specified locations.[109] New Hampshire enacted a discharge permit system for Portsmouth in 1823.[110] New York State enacted a law in 1824 that allowed the Schenectady mayor or other city officials to grant permission for discharge of any

---

[104] Act of 26th August 1721. [An Act of 9th of February, 1750-51], § 1.

[105] John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721.

[106] Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750.

[107] 1750 Pa. Laws 208.

[108] An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

[109] Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802.

[110] 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

gun or various fireworks.[111] Marietta, Ohio enacted a discharge licensing law in 1823 because of concern that "the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered."[112] New London, Connecticut singled out "some public day of review" in an 1835 law as a permissible reason for issuing a discharge permit,[113] and New Haven enacted a similar law in 1845.[114] The same was enacted for Quincy, Illinois in 1841,[115] Jeffersonville, Indiana in 1855,[116] and Richmond, Virginia in 1859.[117]  Such laws were enacted in another 21 states from the end of the Civil War up to the end of the 1800s (not including laws in states enacted both before and after the Civil War: dealers in firearms, Arkansas, California, Colorado, Louisiana, Maine, New Jersey, Oregon, Texas, Vermont, Washington State, West Virginia, Wisconsin, and Wyoming). Most of them applied to specified cities and towns within their states.

### C.    Hunting Licensing Laws

---

[111] Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources.

[112] The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823.

[113] The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835.

[114] 1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, chap. 10.

[115] Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841.

[116] W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855.

[117] The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859.

59.     Many early laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[118] The states with hunting-related laws listed here all allowed hunting as permitted or authorized by or through a government entity or policy, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season, or hunting certain types of game). Hunting licensing or permission laws were enacted in at least 12 states from the 1700s through the early 1900s. Two colonies, New Jersey and New York, enacted laws in the 1700s. The rest spanned the 1800s to the early 1900s.

### D.     Commercial Licensing Laws

60.     As noted, commercial licensing laws were enacted in a total of at least 20 states, enacted with 15 states doing so throughout the 1800s, and 9 states doing so in the early 1900s (laws were enacted in some states in both centuries).

61.     A remarkably early, if limited, commercial licensing law was enacted by the Connecticut colony in 1642. The law barred the sale or barter of weapons to Indigenous people as well as "to any person inhabiting out of this Jurisdiction" but excepted people who first obtained a license to engage in such transactions from "the particular Court" or "two magistrates"[119] to do so. Strictly speaking, this statute was aimed at any individual who might contemplate such trade, but the focus was on regulating commercial activity, to the extent feasible, in the mid-seventeenth century. (The law did not specify the conditions or circumstances under which such a license might be granted.)

---

[118] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 73-74.
[119] Act of Dec. 1, 1642, CONN. GEN. STAT. (Brown & Parsons 1850) (Law Passed 1642).

62.    An 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans for guns, knives, tomahawks, or other items, unless they first obtained a license from the governor.[120] A century later a Chicago ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[121] An 1854 law for San Francisco, California licensed commercial shooting galleries.[122] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements, such as an ordinance for Martinsburg, West Virginia in 1876 that required a license issued by the mayor for the opening and maintenance of a pistol gallery.[123] This historical category of law is consistent with the notion that the government could and can regulate the commercial activity of selling and commercially using weapons.

### E.  Licensing Restrictions on Gunpowder

63.    Gunpowder was widely and extensively regulated in the colonies and states. In fact, every state in the country but one enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century.[124] One element of this regulation

---

[120] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler commerce; it was not a law that licensed Natives to engage in commerce.

[121] Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

[122] Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

[123] J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 76, Image 76 (1875) available at The Making of Modern Law: Primary Sources. 1876.

[124] Mark Anthony Frassetto, "The Duty to Bear Arms: Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment," *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society,* Jacob Charles, Joseph Blocher and

was gunpowder licensing; with such licensing laws enacted in at least 22 states from the 1700s through the early 1900s. This pertained directly to the operation of firearms, as gunpowder was indispensable to firearm discharge for most guns through the post-Civil War period.

### F.    Weapons Sellers Recording Purchases

64.    Aside from direct licensing of weapons purchasers by a government official or entity, at least 17 states had laws that required those who sold or otherwise transferred guns (mostly handguns) or other weapons to others to record information about the buyer, with that information to be maintained and subject to possible later examination. This regulatory mechanism put the burden of information collection and maintenance on the seller or dealer, rather than directly on the government, though it served the same purpose: to acquire and maintain information about those who obtained the weapons in question and when, for future reference or inspection by government officials or others. In some instances these requirements existed along with direct governmental licensing.

In 1885, Illinois enacted this registration requirement for weapons dealers:

> All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public. . . .[125]

---

Darrell Miller, eds. (NY: Oxford University Press, 2023), 206 (the one state with no gunpowder regulation to be found was Arizona); Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73(2004): 510; Adam Winkler, *Gunfight* (NY: W.W. Norton, 2011), 116-17, 286.

[125] Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.

65.     With minor variations, this law was typical of such requirements. For example, a 1911 Colorado law offered this detailed set of instructions:

> Every individual, firm or corporation engaged . . . in the- retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[126]

66.     A 1911 New York law required every person selling any handgun to maintain a register "at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm."[127] The purchaser also had to produce a permit at the time of the transaction, with the seller to note the permit information.  Regulations being placed on the sellers of weapons are a historic normality.

**G.     Licensing Pertaining to Named Groups**

67.     The licensing of "Named Groups" referenced in Exhibit D includes the granting of weapons licenses to non-state residents, non-citizens, minors, felons, the intoxicated (who stood to lose their licenses), and Native Americans/Indigenous people.  Licensing the sale of weapons to Native Americans might seem paradoxical, since white leaders fought protracted conflicts with Natives from the 1600s through the end of the nineteenth century. But whites also

---

[126] 1911 Colo. Sess. Laws 408, Section 3.
[127] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.

traded arms with Natives throughout this entire period, as they sought profitability, access to highly desired goods made available by Indians, and security alliances with some Indians through the supplying of weapons. This steady and enduring trade revealed "the high degree of interdependence between Indians and Euro-Americans."[128] At least seven states imposed nine licensing laws pertaining to Indigenous people.

68.    As for licensing related to enslaved persons and free persons of color (listed as "Pre-Civil War Blacks" in Exhibit D), it is well understood that white racist regimes before the Civil War were frantic to keep weapons out of the hands of enslaved persons, most specifically because "the South was perpetually terrified of slave revolts."[129] The laws listed here, however, are all instances when enslaved persons or free persons of color were allowed to have possession of weapons under listed, restricted circumstances through licensing in the pre-Civil War era. Some whites who owned enslaved persons sought the convenience of allowing the enslaved to carry weapons for hunting or other purposes designated by, and often under the supervision of, the white owners.

69.    Despite assertions that the only pre-twentieth century weapons licensing laws that existed in America pertained to African Americans and Indigenous people,[130] the data presented here demonstrate that, of the many weapons permitting laws enacted during this time, only a very small percent pertained to African Americans: of the 316 permitting laws listed in Exhibit D, 20 (6.3%) enacted in 13 states pertained to African Americans. The nine laws pertaining to Native Americans accounted for fewer than 3% of all licensing laws.

---

[128] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016), 15-16 and passim.
[129] Carl T. Bogus, *Madison's Militia* (NY: Oxford University Press, 2023), 159. See also 98-107.
[130] David B. Kopel, "Background Checks for Firearms Sales and Loans: Law, History, And Policy," *Harvard Journal on Legislation* 53(Winter 2016), 336.

70.     The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain even limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances.

### H.    Regulatory Taxes

71.     Regulatory taxes on weapons, which are defined as "fees imposed by governments on specific activities or behaviors, primarily aimed at discouraging undesirable practices or encouraging compliance with regulations," were enacted in at least nine states.[131] In this category, individual weapons owners were assessed a money tax on various types of weapons they owned with the dual goals of raising revenue but also, in effect, monitoring and regulating the ownership or use of weapons. Failure to pay the tax could result in forfeiture of the weapons in question, or other penalties. For example, an 1867 Alabama law imposed a tax on "all pistols or revolvers in the possession of private persons not regular dealers holding them" of two dollars each, and a three dollar tax on all privately owned "bowie knives, or knives of the like description. . . ." Failure to pay the tax resulted in seizure of the weapons to then be "sold at

---

[131] "Regulatory Taxes," https://library.fiveable.me/key-terms/ap-macro/regulatory-taxes. Political scientist Theodore J. Lowi identifies regulatory taxes as a governmental technique of control designed not simply to raise revenue but to act as a regulatory mechanism to shape behavior. *The End of the Republican Era* (Norman, OK: University of Oklahoma Press, 1995), 46-47. For example, so-called "sin taxes"—taxes on products like cigarettes, alcohol, or gambling—are designed both to raise revenue but also to discourage or minimize the legal behavior being taxed. "Are Sin Taxes Healthy for State Budgets?" *Pew Trusts*, July 19, 2018, https://www.pewtrusts.org/en/research-and-analysis/reports/2018/07/19/are-sin-taxes-healthy-for-state-budgets. Regulatory taxes (also considered a type of excise tax) can also be understood as mechanisms "to offset the costs associated with regulating public safety." "What are Excise Taxes and How Do They Affect the Federal Budget?" *Peter G. Peterson Foundation,* July 15, 2024, https://www.pgpf.org/article/what-are-excise-taxes-and-how-do-they-affect-the-federal-budget/

public outcry before the court house door. . . ."[132] An 1872 ordinance for the city of Galveston, Texas assessed a tax on the owner of any "pistol or rifle gallery."[133] Note that this law is not listed in the category of the licensing of commercial shooting galleries in Exhibit E because in this instance the regulatory mechanism is the tax rather than a license. Failure to pay the tax would presumably result, sooner or later, in the closure of the establishment. To take a different example, a 1909 Delaware state law assessed a special "license fee" of ten dollars on non-state resident "gunners" that was an increase in the earlier fee. The fee was increased because "our neighboring States charge non-resident gunners a license fee of more than Five Dollars."[134] While this law calls it a license fee, the purpose is to increase the financial burden on non-resident gunners, making it a regulatory tax.

## IV.  CONCLUSION

72.    Gun purchase waiting periods are an artifact of the modern era, but with deep roots in American history and tradition. While the idea of waiting periods as a public policy tool was both beyond contemplation and beyond the reach of the immature and undeveloped American nation-state earlier in history, American society did respond to the intersection of weapons acquisition and problematic behavior similar to the modern policy remedy of waiting periods. And as Jacob Charles has persuasively noted, "the absence of positive law. . . . tells us nothing about what our ancestors thought their elected representatives *could* do."[135] There is no

---

[132] The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources. 1867.

[133] Ordinances of the City of Galveston, Taxes – License Tax and Ad-Valorem Tax, Art. 418, § 26.

[134] 1909 Del. Laws 577, House Joint Resolution Providing for Increase in Non-Resident Gunners License Fee, ch. 271.

[135] Jacob D. Charles, "The Dead Hand of a Silent Past: *Bruen*, Gun Rights, and the Shackles of History," 73 *Duke Law Journal* 73(October 2023), 111.

reason to believe that the absence of firearm purchase waiting periods early in American history somehow means that our ancestors would have disapproved of such a policy option now. Far from it, especially considering the inherently modest nature of waiting periods.

73.    The examples of old weapons laws pertaining to intoxication and weapons, and old licensing/permitting laws, provide remarkably similar analogs to modern waiting period laws.

74.    For historic guns and intoxication laws, "sobering up" might be thought of as the historic equivalent of the modern waiting period "cooling off" period. Intoxication laws and licensing laws both utilized the passage of time.

75.    Historic weapons licensing laws contemplated an evaluation process to improve the likelihood that individuals who sought access to firearms did not obtain that access until they were approved to receive a license. No licensing law examined here imposed a time limit for the issuance of a license, and many of these laws gave the license issuer discretion to withdraw said license if, in the judgment of the issuer, the recipient failed to abide by the terms under which the license was issued.

76.    When our ancestors in the colonial, post-colonial, and developmental periods of the seventeenth, eighteen, and nineteenth centuries encountered social, behavioral, and other problems with respect to firearms, they responded with public policy techniques appropriate to their time, place, and circumstances. The examples pertaining to alcohol consumption and weapons licensing are all appropriate examples that are analogous to modern waiting period laws.

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge.

Executed on  December 23, 2024, at Williamsburg, VA.

*Robert J. Spitzer*
Dr. Robert Spitzer

42