# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ANDREA BECKWITH, EAST COAST SCHOOL OF SAFETY, NANCY COSHOW, JAMES WHITE, J WHITE GUNSMITHING, ADAM HENDSBEE, A&G SHOOTING, THOMAS COLE, and TLC GUNSMITHING AND ARMORY, <br><br> *Plaintiffs*, <br><br> v. <br><br> AARON FREY, in his personal capacity and in his official capacity as Attorney General of Maine, <br><br> *Defendant*. | Civil Action No. 1:24-cv-384-LEW |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

The state's response confirms the need for injunctive relief. The Supreme Court has made explicit that laws that "broadly restrict arms use" without regard to individualized concerns defy this Nation's historical tradition of firearm regulation. *United States v. Rahimi*, 602 U.S. 680, 698 (2024). Yet Maine does not even attempt to reconcile Section 2016, which imposes a 72-hour "cooling-off" period on nearly all firearm acquisitions in the state, with that command. Adding insult to injury, the state brushes off the Second Amendment rights of domestic-violence victims, insisting that women living in fear of imminent violence not only do not need a firearm, but fail to realize that they are actually better off without one. That ivory-tower response is not just callous, but the *ne plus ultra* of treating the Second Amendment "as a second-class right." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality). Section 2016 should be enjoined.

I.  **Plaintiffs Are Likely to Succeed On The Merits.**

   A.  **Section 2016 Regulates Conduct Protected by the Second Amendment.**

The state begins by arguing that Section 2016 should escape constitutional scrutiny because the Second Amendment does not explicitly say "purchase" or "acquire" alongside "keep" and "bear." Nonsense. The Second Amendment does not need to include those words because laws that prevent people from acquiring arms self-evidently restrict the right to "keep and bear Arms." "[K]eep Arms" means "to 'have weapons,'" and "'bear mean[s] to 'carry' … for the purpose … of being armed and ready for offensive or defensive action." *District of Columbia v. Heller*, 554 U.S. 570, 582, 584 (2008) (last alteration in original). Because people cannot do either of those things if they cannot acquire the arms they wish to keep and bear, laws that prevent them from doing so plainly "regulate[] arms-bearing conduct." *Rahimi*, 602 U.S. at 691. Any other conclusion would render the Second Amendment pointless, as states could ban all firearm purchases with impunity.

That Section 2016 restricts rights for three days rather than an eternity makes no difference. Either way, the right is impeded. Consider Plaintiff Nancy Coshow, who went to a gun store,

1

picked out a firearm, passed the background check, and paid in full, but could not walk out with it for 72 more hours. *See* Dkt.1-2.¶6. Or consider the first-time gun buyers facing imminent threats of violence described by Plaintiffs James White and Adam Hendsbee. *See* Dkt.1-3.¶¶6-7, Dkt.1-4.¶9. Because of Section 2016, they cannot keep or bear a firearm for 72 hours. No reasonable person would understand that as anything other than a restriction on Second Amendment conduct. And nothing in *Heller*, *McDonald*, *Bruen*, or *Rahimi* so much as hints that laws do not implicate the Second Amendment unless they foreclose the exercise of the right entirely.

The state fares no better with its claim that *Bruen* "recognized that laws causing delays in taking possession of firearms do not … implicate the right to keep and bear arms." Opp.6. To be sure, *Bruen* made clear that it was not calling into question "'shall-issue' licensing regimes" as a general matter. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022). But that was not because they do not implicate the Second Amendment. The whole point of *Bruen* footnote 9 was to make clear that such laws typically remain permissible—*even though they do* implicate the right—because they fit comfortably within the historical tradition of permissible delays "to ensure … that those bearing arms in [a] jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* If laws that delay the exercise of the right did not implicate the Second Amendment *at all*, then the Court would not have needed to caveat that even shall-issue regimes (which, to be clear, Section 2016 is not) can be unconstitutional if the wait time is unnecessarily "lengthy." *Id.*

*Bruen* likewise forecloses Maine's effort to shift the threshold inquiry from *whether* its law "regulates arms-bearing conduct," *Rahimi*, 602 U.S. at 691, to the precise manner in which it does so (i.e., by preventing "the immediate purchase of firearms"). Opp.7. The restriction in *Bruen* precluded citizens from carrying handguns only in public. 597 U.S. at 11-12. Yet the Court did not ask at the threshold whether the Amendment's text explicitly confers a right to carry handguns

"in public." It was sufficient at the threshold that "the Second Amendment's text" does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *id.* at 32, meaning any effort to draw such a distinction would instead have to be grounded in historical tradition. Here, too, the text says nothing about how long people may be forced to wait to keep and bear arms, so any effort to delay the exercise of that right must be assessed against historical tradition.

Finally, Section 2016 is not a "presumptively valid" "condition[] [or] qualification[] on the commercial sale of arms." *Contra* Opp.8. A condition or qualification is something a person can satisfy, e.g., by passing a background check or taking a safety course. *See, e.g.*, *Condition*, Black's Law Dictionary (12th ed. 2024) ("an uncertain act or event that," if satisfied, "triggers or negates a duty to render a promised performance"). But there is no way to satisfy Section 2016; all people can do is wait. That is not a condition or qualification. It is a prohibition. And *contra* Opp.9, nothing in *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024), or *B&L Productions, Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024), says otherwise, as neither case confronted any argument about whether prohibitions are conditions or qualifications.

In all events, the Supreme Court has not said that all "conditions and qualifications on the commercial sale of arms" are "presumptively lawful"; it has always included the critical caveat that only "longstanding" laws enjoy that presumption. *Heller*, 554 U.S. at 626-27 & n.26; *see also Bruen*, 597 U.S. at 36-37 (noting that regulatory "innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]" (alteration original)).[1] As the state does not dispute, no waiting period of any kind on firearm purchases came

---

[1] The state's effort to read the word "longstanding" out of *Heller* runs headlong into *Bruen*, which "ma[d]e[] clear that text, history, and tradition are the '[o]nly' ways the Government can justify a regulation that implicates Second Amendment rights." *United States v. Perez-Garcia*, 96 F.4th 1166, 1177 (9th Cir. 2024); *see Bruen*, 597 U.S. at 17; *accord Rahimi*, 602 U.S. at 691-92.

3

about until 1923, and the first law forcing people *who have already passed a background check* to "cool off" before taking possession of a firearm was not enacted until 1996. Laws enacted when most courts did not even treat the Second Amendment as an individual right plainly cannot qualify as sufficiently "longstanding" to avoid constitutional scrutiny altogether.

        **B.**        **Section 2016 Flouts Historical Traditions of Firearm Regulation.**

As the above indicates, once the burden to justify Section 2016 shifts to the state, this case is all but over: The first law that made everyone wait to exercise their right to keep and bear arms *even after they proved their law-abiding character*, for fear that some people might immediately act violently, was not enacted until the 1990s. Indeed, the historical record is so clear that the state could not prevail even if Plaintiffs somehow bore the burden of proving that Section 2016 is *not* "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

To force-fit Section 2016 into our historical tradition of firearm regulation, Maine rehashes the same strained analogies to historical intoxication laws and licensing regimes that other states have used to defend other recent cooling-off period laws. Admittedly, district courts in Vermont and Colorado preliminarily upheld cooling-off period laws based on these analogies. *See Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 2024 WL 3466482, at *25-28 (D. Vt. July 18, 2024); *Rocky Mt. Gun Owners v. Polis*, 701 F.Supp.3d 1121, 1144-45 (D. Colo. 2023). But a district court in New Mexico declined to stretch them to cover that state's cooling-off period law—and for good reason. *See Ortega v. Lujan Grisham*, 2024 WL 3495314, at *36-38 (D.N.M. July 22, 2024).[2]

---

Properly understood, *Heller*'s statement that "*longstanding* … laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful," 554 U.S. at 626-27 & n.26 (emphasis added), is just another way of saying that it is exceedingly unlikely that a law that is part of our Nation's historical tradition nonetheless would be inconsistent with the principles underlying that tradition. *Contra* Opp.9.n.11.

    [2] Ultimately, the *Ortega* court upheld New Mexico's law by analogizing to racist laws from the colonial era restricting firearm sales to Native Americans and slaves on the odious premise that

4

As Maine acknowledges, "[t]he central questions are why and how the regulation at issue burdens Second Amendment rights." Opp.12.  The analogy to historical intoxication laws runs aground on both.  While this Nation's tradition of firearm regulation tolerates burdens on Second Amendment rights "once a defendant has been found to pose a credible threat to the physical safety of others," it looks with much greater suspicion on laws that "broadly restrict arms use by the public generally." *Rahimi*, 602 U.S. at 698, 700.  So Maine might be able to use the intoxication laws to justify a narrow regulation burdening the arms-bearing right of a sliver of the population predisposed to dangerous or impulsive behavior.  But Maine cannot muster a single example of a historical law imposing a blunderbuss burden on *everyone*'s arms-bearing right, on the theory that some might carry while drunk.  That is because the Second Amendment conclusively *rejects* the premise "that a person will act irresponsibly with a firearm." *Contra* Opp.6.n.9.

The analogy to licensing regimes runs aground on the "why."  To be sure, it took time in the horse-and-buggy days to assess whether someone was a law-abiding citizen entitled to bear arms.  But that was what the wait was for; "the officials of old" were looking into "each individual's specific characteristics." *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024).  Under Section 2016, however, someone who has already proven their law-abiding character by passing a background check still must wait three days during which no further investigation is done, on the theory that *everyone* should have to "cool off" before taking possession of a firearm.  Maine cannot identify any historical tradition whatsoever of intentionally delaying the exercise of Second Amendment rights—or any fundamental right, for that matter—for the express purpose of delaying their exercise; again, the first unadorned cooling-off period law was not enacted until the 1990s.

---

those groups were predisposed to violence. *See* 2024 WL 3495314 at *36-38.  Maine notably does not urge that equally strained analogy, and "principle[s] of party presentation" oblige the Court "to decide a case based on the historical record compiled by the parties." *Bruen*, 597 U.S. at 25 n.6.

5

In the end, the most that can be said about Maine's historical analogies is that they are less risible than its contention that impulsive violence and suicide "did not exist at our founding." Opp.12. To be clear, no one denies that suicide and impulsive violence are pressing public-policy problems. They are—and they have been since the Founding, even if Founding-era violence may have more commonly involved "whips, sticks, hoes, shovels, axes, or knives." Dkt.17.¶18. Nor does anyone deny that states can and should have "a variety of tools for combating" them. *Heller*, 554 U.S. at 636. "But the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Id.* And Maine has not come close to demonstrating that our historical tradition countenances laws that delay everyone's ability to acquire a firearm on the theory that even law-abiding citizens who have passed a background check may be inflamed by violent passions simply because they want to exercise their constitutional right to keep and bear arms.

## II.    The Remaining Factors Support Injunctive Relief.

Maine does not dispute that the other preliminary-injunction factors follow from this Court's conclusion on the merits—a damning omission given the strength of Plaintiffs' claims. *See* Opp.18 (arguing only that "plaintiffs … fail to show a likelihood of irreparable injury" because they "are not likely to establish that [Section 2016] violates the Second Amendment"); *see also, e.g.*, *Tirrell v. Edelblut*, --- F.Supp.3d ----, 2024 WL 3898544, at *6 (D.N.H. Aug. 22, 2024) ("The State 'has no interest in enforcing an unconstitutional law, [and] the public interest is harmed by the enforcement of laws repugnant to the United States Constitution.'" (alteration in original)).

The state's glancing standing critiques do not move the needle. Andrea Beckwith and her business have standing to assert the Second Amendment rights of their clients facing threats of domestic violence given the significant hindrances those women face to protect their own interests. *See, e.g.*, *Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007); Dkt.1-1.¶20. And the firearm dealers not only have suffered undeniable economic injury, but have derivative standing to assert

6

their customers' Second Amendment rights. *See Gazzola v. Hochul*, 88 F.4th 186, 194-95 (2d Cir. 2023) (collecting cases from multiple circuits). Unable to deny either point, the state claims only that "it is premature to conclude that [Section 2016] will negatively affect business in the long run." Opp.19.n.16. But "[e]conomic harm to a business clearly constitutes an injury-in-fact," and "the amount is irrelevant": "A dollar of economic harm is still an injury-in-fact." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (Kavanaugh, J.). And, here, sovereign immunity makes that injury irreparable. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

The state's purported "empirical evidence" also falls flat. Reasonable minds may disagree about whether the right to acquire a gun as soon as one passes a background check "is *really worth* insisting upon." *Heller*, 554 U.S. at 634. But Maine does not write on a blank slate: "The Second Amendment 'is the very *product* of an interest balancing'" that "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. at 26. "[I]t is not [the] function [of] judges to read [their] views of policy into a Constitutional guarantee," *Thomas v. Collins*, 323 U.S. 516, 557 (1945), or "to arrogate to [themselves] the power to adjust a balance settled by the explicit terms of the Constitution," *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 486 (1989) (Kennedy, J., concurring).[3]

## CONCLUSION

The Court should grant the motion for preliminary injunctive relief.

---

[3] The state contends that Professor Donohue "explains why" the story of a Wisconsin woman killed by her stalker "is 'improbable.'" Opp.20.n.17 (citing Dkt.16.¶53). But that "explanation" consists of a single citation to a *Daily Beast* article. *See* Dkt.16.¶53. And in the very next paragraph, Professor Donohue admits that "a New Jersey woman was killed in June 2015 after starting the process to procure a state handgun application." Dkt.16.¶54.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Paul D. Clement, VA Bar #37915<br>  (admitted pro hac vice)<br>Erin E. Murphy, VA Bar #73254<br>  (admitted pro hac vice)<br>Matthew D. Rowen, VA Bar #100113<br>  (admitted pro hac vice)<br>Kevin Wynosky, PA Bar #326087<br>  (admitted pro hac vice)<br>CLEMENT & MURPHY, PLLC<br>706 Duke Street<br>Alexandria, VA 22314<br>(202) 742-8900<br>paul.clement@clementmurphy.com<br>erin.murphy@clementmurphy.com<br>matthew.rowen@clementmurphy.com<br>kevin.wynosky@clementmurphy.com | /s/Joshua A. Tardy<br>Joshua A. Tardy<br>Brent A. Singer<br>RUDMAN WINCHELL<br>84 Harlow Street<br>PO Box 1401<br>Bangor, Maine 04402<br>(207) 947-4501<br>jtardy@rudmanwinchell.com<br>bsinger@rudmanwinchell.com |

*Counsel for Plaintiffs*

January 17, 2025

8